**NORTH JERSEY MEDIA GROUP, INC.; New Jersey Law Journal, Plaintiffs,**

**v.**

**John ASHCROFT, Attorney General of the United States; Hon. Michael Creppy, Chief Immigration Judge of the United States, Defendants.**

No. Civ.A. 02-967(JWB).

United States District Court, D. New Jersey.

May 28, 2002.

Gibbons, Del Deo, Dolan, Griffinger & Vecchione, by Lawrence S. Lustberg, Shavar D. Jeffries, Newark, New Jersey, American Civil Liberties Union of New Jersey Foundation, by Edward Barocas, Newark, New Jersey, Georgetown University Law Center, by David Cole, Washington, D.C., American Civil Liberties Union,

by Steven R. Shapiro, Lucas Guttentag, Lee Gelernt, New York City, Center for Constitutional Rights, by Nancy Chang, Shayana D. Kadidal, New York City, for plaintiffs.

United States Department of Justice, Civil Division, by Robert D. McCallum, Jr., Assistant Attorney General, Civil Division, Michael P. Lindemann, Assistant Director, Terri J. Scadron, Senior Litigation Counsel, Brenda M. O'Malley, Trial Attorney, Laura L. Flippin, Office of Immigration Litigation U.S. Department of Justice, Civil Division, Washington, D.C., Christopher J. Christie, United States Attorney, by Michael A. Chagares, Chief, Civil Division, Newark, New Jersey, for defendants.

Reitman Parsonnet, by Bennet Zurofsky, Newark, New Jersey, for amicus curiae.

## OPINION

BISSELL, Chief Judge.

This matter comes before the Court pursuant to plaintiffs' motion for a preliminary injunction. Defendants have filed opposition to the motion and have cross-moved for dismissal for lack of jurisdiction and for failure to state a claim.

Federal subject matter jurisdiction is asserted under 28 U.S.C. § 1331.

## FACTUAL AND PROCEDURAL BACKGROUND

This action was initiated with the filing of a Complaint in this Court on March 6, 2002. Plaintiff North Jersey Media Group, Inc. is the publisher of the Herald News and the Record, two daily newspapers serving the northern New Jersey area. Plaintiff New Jersey Law Journal publishes a weekly newspaper covering law and public affairs. Plaintiffs allege that defendants John Ashcroft, the Attorney General of the United States, and the Honorable Michael Creppy, Chief Immigration Judge (collectively, "defendants" or "the government") have denied plaintiffs' right of access to certain deportation proceedings as protected by the First Amendment of the United States Constitution and federal regulation, specifically 8 C.F.R. § 3.27.

The facts alleged in the Complaint are as follows: Ten days after the terrorist attacks of September 11, 2002, Chief Immigration Judge Michael Creppy issued a memorandum to all Immigration Judges and Court Administrators, informing them that the Attorney General " 'has implemented additional security procedures for certain cases in the Immigration Court.' " (Compl., ¶ 9) (quoting Memorandum from Chief Judge Michael Creppy to Immigration Judges of Sept. 21, 2001 ("Creppy Memo"), attached to Complaint as Exhibit A). To these "special interest" cases, the Creppy Memo applies a series of "additional security" procedures. Among these procedures is the requirement that Immigration Judges "hold the hearings individually, [ ] close the hearing to the public, and [ ] avoid discussing the case or otherwise disclosing any information about the case to anyone outside the Immigration Court.' " (Id., ¶ 10). Moreover, every special interest case " 'is to be heard separately from all other cases on the docket,' " and " '[t]he courtroom must be closed for these cases—no visitors, no family, no press.' " (Id., ¶ 11). The Creppy Memo restricts public access to docket information, as well, specifically providing that " 'restriction on information includes confirming or denying whether [a] [special interest case] is on the docket or scheduled for a hearing.' " (Id., ¶ 12). The restrictions and closure procedures of the Creppy Memo apply to all cases selected by the Attorney General. There is no provision in the Creppy Memo for an individualized determination of the reasons for closure in a given case. Furthermore, the directive

does not require the government to demonstrate whether measures other than closure would serve its interests. (*Id.*, Exh. A).

Plaintiffs allege, on information and belief, that scores, if not hundreds, of immigration hearings are currently being closed in this district pursuant to the Creppy Memo. For example, on November 22, 2001, Jim Edwards, a reporter for the Law Journal, was denied access to proceedings before the Immigration Court by court personnel acting under the dictates of the Creppy Memo. On February 13, 2002, Edwards was denied access to a hearing to be held the following day regarding Ahmed Raza before Immigration Judge ("IJ") Eugene Pugliese in Newark. On the day of the hearing, IJ Pugliese closed the proceedings pursuant to the Creppy Memo, barring Hillary Burke, a reporter for the Herald, from observing the proceedings. On the previous day, Burke was refused docket information with respect to special interest cases. On February 21, 2002, Edwards and Burke attempted to attend the removal hearing of Malek Zeidan,[1] a resident alien, before IJ Annie Garcy in Newark. When Judge Garcy called Zeidan's case, she asked the attorney for the INS whether the matter was a special interest case. Upon the attorney's affirmative response, Judge Garcy closed the hearing, ordering all members of the public, including the two reporters, to leave the courtroom. It is alleged that these instances are

illustrative of a great many additional proceedings that will be similarly restricted under the dictates of the Creppy Memo.

## DISCUSSION

This matter came before the Court on motions by the government to dismiss the Complaint for lack of subject matter jurisdiction and for failure to state a claim and by the plaintiffs for a preliminary injunction. Although it had already been fully briefed, the government indicated at oral argument that it was no longer pursuing its jurisdictional motion, conceding that general federal question jurisdiction was present under 28 U.S.C. § 1331. However, subject matter jurisdiction cannot be conferred by consent of the parties; it must be determined by the Court. Therefore, this Opinion begins with a discussion of the jurisdictional concerns raised originally by the government. The Court will then provide a consolidated discussion of the legal merits of plaintiffs' claims. Finally, the Court will address the remaining elements of the preliminary injunction motion.

## I. GOVERNMENT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION IS DENIED.

### A. Standard for Motion to Dismiss for Lack of Subject Matter Jurisdiction

It is axiomatic that the jurisdiction of the federal courts is limited and that the

---

1. On February 28, 2002, Zeidan filed a Complaint in this Court challenging the Creppy Memo as it applied to his removal proceedings. *See Zeidan v. Ashcroft*, Civil 02–843 (JWB). The Complaint asserted claims arising under the Due Process Clause of the Fifth Amendment, an INS regulation, and the Administrative Procedures Act. Since the filing of that action, the government removed the "special interest" designation from his case, and moved to dismiss the action as moot. By letter of April 2, 2002, Bennet Zurofsky, counsel for Mr. Zeidan, confirmed that he would

not oppose the government's motion. Accordingly, the *Zeidan* case was dismissed without prejudice on April 16, 2002.

The Court requested Mr. Zurofsky to appear as amicus in the instant matter to address the implications of the Creppy Memo on a "special interest" alien. The Court has benefitted from Mr. Zurofsky's submission and argument, particularly with respect to due process. As discussed, *infra*, due process considerations are intertwined with the inquiry into whether there exists a tradition of openness in connection with deportation proceedings.

district courts are permitted to decide only claims falling within their subject matter jurisdiction as prescribed by the Constitution or federal statute. *See* U.S. Const. art. III, § 2; *Rice v. United States, BATF,* 68 F.3d 702, 706 (3d Cir.1995). Proper adjudication depends on the existence of subject matter jurisdiction at all times throughout the duration of the case. Never presumed to exist, federal subject matter jurisdiction must be affirmatively demonstrated by the party seeking to invoke it before the court may proceed to the merits of the case. *Philadelphia Federation of Teachers v. Ridge,* 150 F.3d 319, 323 (3d Cir.1998); *Development Finance Corp. v. Alpha Housing & Health Care, Inc.,* 54 F.3d 156, 158 (3d Cir.1995).

### B. Application

In its moving papers, the government argued that various sections of the Immigration and Nationality Act ("INA"), as amended by the Illegal Immigrant Reform, and Immigrant Responsibility Act of 1996 ("IIRIRA"), 110 Stat. 3009–546, preclude jurisdiction over the instant action.[2] Specifically, the government argued that this Court's jurisdiction to hear this action is barred by 8 U.S.C. § 1252(a)(1), (b)(9), (f)(1), (g).

As an initial matter, the Court observes that this suit is brought under the general federal question statute, 28 U.S.C. § 1331, by organizations of the press alleging that an administrative directive has denied them a right of access to immigration hearings that is protected by the First Amendment and federal regulations. These claims undoubtedly raise federal questions within the meaning of § 1331. Assuming for the moment the existence of plaintiffs' right of action, the relevant inquiry is whether the statutory sections cited by the government withdraw what would otherwise be valid subject matter jurisdiction over these claims.

### 1. Preliminary Issues

Before turning to the language of these sections, it is important to discuss certain presumptions that are implicated here. First, when examining legislation that arguably affects the court's jurisdiction, there is a presumption in favor of finding judicial review of administrative actions. *INS v. St. Cyr,* 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Furthermore, in traditionally sensitive areas, courts presume that Congress does not intend to foreclose jurisdiction unless it does so in clear and plain terms. *Gregory v. Ashcroft,* 501 U.S. 452, 461, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Although this principle has often been invoked where the issue is a purported congressional abrogation of the states' Eleventh Amendment immunity, *see, e.g., Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), or a repeal of habeas jurisdiction, *see, e.g., St. Cyr,* 533 U.S. at 298–99, 121 S.Ct. 2271, it flows from the longstanding recognition

---

**2.** Alternatively, the government suggested that this case is moot, observing that the two aliens named in the complaint and as to whom the Creppy Memo had been applied are no longer of "special interest." The Court believes that any mootness concerns would be obviated by the exception for cases "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). Appli-

cation of that exception is appropriate because (1) it is reasonably assumed that these plaintiffs will again be denied access to other special interest hearings and (2) immigration hearings are usually of brief duration. *See Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 602, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (applying exception to mootness in similar circumstances).

that repeals by implication are not favored. Indeed, they are disallowed when legislation is capable of an alternative construction that is compatible with judicial review. *Ex parte Yerger,* 8 Wall. 85, 19 L.Ed. 332 (1868). This Court believes that this precept is apt where, as here, a defendant asserts repeal of federal subject matter jurisdiction to entertain claims under the First Amendment.

 Furthermore, the Supreme Court has recognized that these presumptions are reinforced by customary canons of interpretation. Specifically, the Supreme Court has advised that "when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *St. Cyr,* 533 U.S. at 299, 121 S.Ct. 2271. Moreover, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible' we are obligated to construe the statute to avoid such problems." *(Id.* at 299–300, 121 S.Ct. 2271) (citations omitted). Both canons are in play in the present action because the government advanced the view of the IIRIRA sections that would deprive a federal court of jurisdiction to hear a constitutional claim. The consequence of this position in the present case is to negate any opportunity for plaintiffs to raise a pure question of law in any court. *St. Cyr,* 533 U.S. at 300, 121 S.Ct. 2271 ("A construction of the amendments at issue that would entirely preclude review of a pure question of law by any court would give rise to substantial constitutional questions.") Though the government argued that the instant claims are foreclosed from jurisdiction under the INA, as amended, it failed to explain how these plaintiffs would be permitted to raise a First Amendment challenge to the Creppy Memo in the context of an immigration proceeding to which they are not parties. A statutory interpretation having the effect of precluding any judicial scrutiny of an asserted constitutional violation cannot be imposed if a reasonable alternative construction is available.

### 2. Analysis

 The particular statutory provisions cited by the government are found in the INA, as amended by the IIRIRA, codified at 8 U.S.C. § 1252. The first indication that these provisions do not affect this Court's jurisdiction is the title of § 1252 which, though not dispositive, states: "Judicial review of orders of removal." 8 U.S.C. § 1252. This language appears to define the scope of the provisions to follow. This appearance is confirmed in the immediately succeeding subsection, which provides:

**(a) Applicable provisions**

(1) General orders of removal

Judicial review *of a final order of removal* (other than an order of removal without a hearing pursuant to section 1225(b)(1) of this title) is governed only by chapter 158 of Title 28, except as provided in subsection (b) of this section and except that the court may not order the taking of additional evidence under section 2347(c) of Title 28.

8 U.S.C. § 1252(a)(1) (emphasis added). Section 1252(a)(2) goes on to exclude jurisdiction, except as provided in subsection (e), over any claim "arising from or relating to the implementation or operation of an *order of removal* pursuant to section 1225(b)(1)." 8 U.S.C. § 1252(a)(2) (emphasis added). The language of limitation employed in these subsections is critical to defining both the scope of their application and the consequent impact of existing grants of jurisdiction. The clear import of

these provisions is that they apply only to orders of removal and their consequences.

Also cited in the government's brief is § 1252(g), which provides:

(g) Exclusive jurisdiction

Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). The government argued that the present action is one that challenges a decision of the Attorney General to commence proceedings, adjudicate cases, or execute removal orders. In fixing the scope of this provision, the Supreme Court's decision in *Reno v. American-Arab Anti-Discrimination Committee* 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) ("*AADC*") is most instructive.

In *AADC*, the issue was whether § 1252(g) deprived the district courts of jurisdiction over aliens' claims that the INS was enforcing selectively against them certain administrative requirements, in violation of the First Amendment. Interpreting the scope of § 1252(g) the Court rejected the position taken by both parties, which was "the unexamined assumption that § 1252(g) covers the universe of deportation claims—that it is a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review.' " (*Id.* at 482, 119 S.Ct. 936). Rather, the Court held that § 1252(g) applies to three discrete actions that may be taken by the Attorney Gener-

al, namely, to *commence* proceedings, *adjudicate* cases, or *execute* removal orders. (*Id.*) The Court acknowledged a range of other actions that may be part of the deportation process but not within the meaning of § 1252(g), such as the decisions to "open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse consideration of that order." [3] (*Id.*) The Third Circuit has also recognized this rather narrow scope of § 1252(g). *Liang v. INS*, 206 F.3d 308, 318 (3d Cir.2000). Here the Creppy Memo's closure mandates are not within the limited meaning of § 1252(g).

Moreover, the government sought to avoid the obvious incongruity between § 1252(g)'s "by or on behalf of any alien" language and the fact that the instant claims are brought, not by or on behalf of aliens, but by press organizations in their own rights, by contending that the provisions of subsection (b)(9) consume even the instant claims. Section 1252(b)(9) is but one of a number of statutory requirements for the specialized review established by § 1252(a)(1). As the Court has already observed, this entire procedure as a fundamental matter is tied to orders of removal. Specifically, § 1252(b)(9) provides:

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought *to remove an alien from the United States under this subchapter* shall be available only in judicial review of a final order under this section.

---

**3.** Because § 1252(g) applied to the Attorney General's decision to prosecute the aliens, the Court held that the district court lacked juris- diction over their claims of selective prosecution. *AADC*, 525 U.S. at 487, 119 S.Ct. 936.

8 U.S.C. 1252(b)(9) (emphasis added). Clearly, the terms of this section, as well, limit its applicability to the removal context. In contradistinction, the Court regards the instant claim as stemming from a government order that affects the right of access of the press and public to administrative hearings arising independent of any action or proceedings to remove an alien from the United States.

Finally, the government relied in its jurisdictional motion on § 1252(f)(1).[4] First and foremost, this provision is not jurisdictional in nature, but is clearly a limitation on injunctive relief. Second, it prohibits injunctions that block the operation of the provisions of 8 U.S.C. §§ 1221–1231. Here, plaintiffs challenge the operation of the Creppy Memo, which is collateral, at best, to the substantive operation of the provisions specifically insulated from injunctive remedies by § 1251(f)(1). Third, even assuming that § 1252(f)(1) applied to this case, it would limit only the Court's authority to grant injunctive relief and not impact the possibility of granting declaratory relief, which is also sought.

In sum, the Court determines that none of the provisions of the INA discussed above deprive this Court of jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.[5] Accordingly, the Court will proceed to discuss the merits of plaintiffs' claims, addressing both the

government's motion to dismiss for failure to state a claim and the "merits" prong of the preliminary injunction analysis.

## II. THE COMPLAINT STATES A CLAIM IN PART AND PLAINTIFFS HAVE SHOWN A REASONABLE PROBABILITY OF SUCCESS ON THE MERITS IN PART.

### A. Standard for Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law. *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When considering a Rule 12(b)(6) motion, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff. *Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir.1997). The motion to dismiss will be granted only when it is beyond doubt that plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir. 1996) (citing *Conley,* 355 U.S. at 45, 78 S.Ct. 99).

---

4. Section 1252(f)(1) provides:

(f) **Limit on injunctive relief**
(1) In general
Regardless of the nature of the action or claim or of the identify of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. § 1221–1231] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f).

5. With respect to its determinations as to 8 U.S.C. § 1252(b)(9), (f)(1) and (g), this Court is in accord with the decision of the United States District Court for the Eastern District of Michigan in *Detroit Free Press v. Ashcroft,* 195 F.Supp.2d 948 (E.D.Mich. 2002) (Edmunds, J.), involving a suit brought to challenge the very same Creppy Memo, in which that court denied similar arguments advanced by the government on its motion to dismiss.

## B. Standard for Preliminary Injunction

The grant of a preliminary injunction is an extraordinary remedy that should be granted only in limited circumstances. *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988). This is particularly so when "the motion comes before the facts are developed to a full extent through the normal course of discovery." *AT & T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994). The primary purpose of a preliminary injunction is to preserve the status quo of an action pending final determination. *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1150 (3d Cir.1982).

It is well settled that in order to grant a preliminary injunction, the court must determine:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.1999). " 'The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief.' " *Merchant Evans, Inc. v. Roosevelt Building Products*, 963 F.2d 628, 632–33 (3d Cir.1992) (quoting *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 192 (3d Cir.1990)).

## C. Count I: Plaintiffs' Claim for Violation of a Right of Access to Deportation Proceedings Arising Under the First Amendment

### 1. Congress' Plenary Authority Over Immigration Policy

In this action, plaintiffs claim a right of access to deportation proceedings under the First Amendment. As a threshold contention, the government submits that judicial recognition of such a right is precluded because the authority of the political branches of government is plenary in immigration matters.

■ Although cases recognize that Congress' power to determine who may enter and remain in the United States is plenary, *Kleindienst v. Mandel*, 408 U.S. 753, 766, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Galvan v. Press*, 347 U.S. 522, 531–32, 74 S.Ct. 737, 98 L.Ed. 911 (1954), it is equally established that this power must be administered in a manner that respects procedural safeguards of due process.[6] *Galvan*, 347 U.S. at 531, 74 S.Ct. 737 ("In the enforcement of [Congress' substantive immigration] policies, the Executive Branch of the Government must respect the procedural safeguards of due process...."); *Yamataya v. Fisher*, 189 U.S. 86, 100–101, 23 S.Ct. 611, 47 L.Ed. 721 (1903) ("*The Japanese Immigrant Case*") (recognizing due process right of resident aliens to hearing on issues concerning right to remain in United States). This distinction between the substantive power of Congress to set immigration policy and the *procedures* chosen to effectuate that policy runs throughout the Supreme Court's jurispru-

---

**6.** The Court notes that the case law uniformly recognizes that only aliens who are deemed to have entered the territory of the United States enjoy the protections of due process. *Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (observing that cases entitled a continuously present resident alien to a fair hearing and due process when threatened with deportation). Here, plaintiffs have made clear that their challenge does not extend to exclusion proceedings.

dence. *Zadvydas v. Davis,* 533 U.S. at 695, 121 S.Ct. 2491; *INS v. Chadha,* 462 U.S. 919, 940–41, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). To wit, the Court has cautioned that "[t]he substantive power is subject to important constitutional limitations." *Zadvydas,* 533 U.S. at 695, 121 S.Ct. 2491.

The government insists that the restrictions at issue on a purported First Amendment right to access is within the plenary substantive authority of Congress. The case they rely upon most heavily is *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), involving an action to compel the Attorney General to admit a Marxist scholar to the United States whom American plaintiffs had invited to participate in academic conferences and discussions. The Attorney General denied requests to exercise his discretion to waive (as it pertained to the scholar) a statutory exclusion that expressly prohibited admission to aliens who advocate world communism or totalitarianism. (*Id.* at 760, 92 S.Ct. 2576). The plaintiffs argued that the decision violated their First Amendment right to receive the ideas and viewpoint of the scholar. The Supreme Court, though recognizing that legitimate constitutional rights were implicated, rejected the proposition that Congress' substantive power to "make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden" may not be exercised where it would deny First Amendment rights. (*Id.* at 766, 92 S.Ct. 2576). Moreover, the Court

held that the exercise of discretionary authority by the Attorney General under the challenged provision was insulated from judicial scrutiny if supported by a "facially legitimate and bona fide reason...." (*Id.* at 770, 92 S.Ct. 2576). The government argues that the dictates of the Creppy Memo are subject to the same deferential treatment.

The Court disagrees with the government that *Kleindienst* provides the applicable standard for this case, and in no way sees it as a rule for decision here. Significantly, the challenged government action in *Kleindienst,* as in the other cases cited by the government,[7] was inextricably related to a particular substantive judgment by Congress in setting admission policy. Accordingly, it was deemed an exercise of substantive plenary authority. At issue here, however, is a blanket directive issued by the Executive Branch to close deportation hearings in "special interest" cases, attenuated from any particular policy determination made by Congress with respect to admission of immigrants. It is essentially a procedural mechanism that has been chosen to implement the substantive dictates of the immigration policy. Moreover, as revealed by its own arguments, the aim of the Creppy closure restrictions is not principally to advance the application of the immigration statutes but, rather, to serve other law enforcement objectives. In sum, the Court determines that the Creppy Memo is not immune from judicial review under the guise of substantive plenary authority.[8]

---

7. In these cases, the courts of appeals upheld an immigration regulation imposing a two-year foreign residency requirement on aliens who marry citizens during deportation proceedings against challenges that the regulation interfered with the citizen spouses' fundamental right of marriage. *Azizi v. Thornburgh,* 908 F.2d 1130, 1133–36 (2d Cir. 1990); *Almario v. Attorney General,* 872 F.2d 147, 150–52 (6th Cir.1989); *Anetekhai v. INS,* 876 F.2d 1218, 1220–24 (5th Cir.1989).

8. Moreover, a proper understanding of *Kleindienst* shows that it does not support the government's contention that, conceptually, the notion of plenary congressional authority over setting immigration policy negates the existence of First Amendment rights. Rather, *Kleindienst recognized* that plaintiffs may possess First Amendment rights in disputes over immigration decisions.

In this event, the government contends that even decisions dubbed "procedural" should be subjected to the deferential *Kleindienst* standard. Whatever may be said about this broad contention, the cases cited by the government do not support application of the *Kleindienst* standard to the action challenged here. For instance, the government cites with approval *Landon v. Plasencia*, 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), which directs that, in considering the extent of due process appropriate to a given immigration situation, courts should recognize that immigration matters are largely subject to the control of the political branches. While this is undoubtedly true, what is pertinent here is whether there are restrictions on judicial review of the press and public's right of access to deportation proceedings under the First Amendment. Significantly, *Landon* does not provide an answer to this question.

### 2. Determining the Existence of a First Amendment Right of Public Access to Deportation Proceedings

#### a. Selecting the Applicable Standard

■ The next issue to be considered is whether the First Amendment affords to the press and public a right of access to deportation hearings. Plaintiffs argue that the right of access should be governed by the standards set forth in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), and its progeny. The government responds that this test is not appropriate, and, assuming that it is, that plaintiffs cannot demonstrate a right of access to deportation hearings by its standards.

In *Richmond Newspapers*, the Supreme Court was asked to decide "whether a criminal trial itself may be closed to the public upon the unopposed request of a defendant, without any demonstration that closure is required to protect the defendant's superior right to a fair trial, or that some other overriding consideration requires closure." (*Id.* at 564, 100 S.Ct. 2814). Summarizing the evolution of the modern criminal trial, the Court observed that presumptive openness of the proceedings to the public was a constant feature. Notwithstanding that no constitutional provision expressly guaranteed a public right of access to judicial proceedings, the Court found that the freedoms guaranteed by the First Amendment, shared a "common core purpose of assuring freedom of communication on matters relating to the functioning of government." (*Id.* at 575, 100 S.Ct. 2814). Put in the context of the case before it, the Court surmised: "[w]hat this means in the context of trials is that the First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that the Amendment was adopted." (*Id.* at 576, 100 S.Ct. 2814).[9]

In the wake of *Richmond Newspapers*, courts have repeatedly referred to the decision as authority for the numerous interests that are served by open judicial proceedings, such as:

> promotion of informed discussion of governmental affairs by providing the public with the more complete understanding of the judicial system; promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings; providing

---

9. Although there was no majority opinion in *Richmond Newspapers,* seven members of the Court agreed that a right of public access to criminal trials is embodied in the First Amendment and applied to the states through the Fourteenth Amendment. *See Globe Newspaper v. Superior Court,* 457 U.S. 596, 603 and n. 11, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982).

a significant community therapeutic value as an outlet for community concern, hostility and emotion; serving as a check on corrupt practices by exposing the judicial process to public scrutiny; enhancement of the performance of all involved; and discouragement of perjury. *United States v. Smith,* 787 F.2d 111, 114 (3d Cir.1986) (summarizing *Richmond Newspapers*); *United States v. Criden,* 675 F.2d 550, 555–56 (3d Cir.1982). These traditionally recognized interests are by no means exclusive. *See, e.g., United States v. Raffoul,* 826 F.2d 218, 224 (3d Cir.1987) ("Open trials enable the public to scrutinize the performance and demeanor of police, prosecutors, and the judiciary and to detect bias or incompetency.") (" 'Every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.' ") (quoting *Cowley v. Pulsifer,* 137 Mass. 392 (1884) (Holmes, J.)).

Moreover, the considerations giving rise to the presumption of openness espoused in *Richmond Newspapers* have been distilled into a working standard. Specifically, in *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 9, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) ("Press–Enterprise II"), the Court determined that the existence of a qualified First Amendment right to access proceedings turns on the complementary considerations of "experience" and "logic." The experience factor considers whether there is a "tradition of accessibility" attendant to a given place and process. (*Id.* at 8, 106 S.Ct. 2735). The logic factor asks whether public access plays a significant positive role in the functioning of the particular process in question. (*Id.* at 8–9, 106 S.Ct. 2735). When both are present, a qualified First Amendment right to public access attaches with respect to the particular proceedings. (*Id.* at 9, 106 S.Ct. 2735; *see also United States v. Simone,* 14 F.3d 833, 837 (3d Cir.1994)).

The government argues that the existence of any First Amendment right of access to deportation hearings is foreclosed outright by *Houchins v. KQED, Inc.,* 438 U.S. 1, 14, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978), and *Capital Cities Media, Inc. v. Chester* 797 F.2d 1164, 1167 (3d Cir. 1986) (*en banc*). In *Houchins,* the Supreme Court ruled against members of the press who sought access to county jail facilities asserting that the First Amendment guaranteed them a first-hand opportunity to inspect prison conditions. 438 U.S. at 15–16, 98 S.Ct. 2588. Similarly, in *Capital Cities,* the Third Circuit disavowed the existence of an asserted First Amendment right of public access to agency documents pertaining to water contamination. 797 F.2d at 1176. Significantly, both of these cases concerned purported rights of access to or disclosure of government-held information; they did not involve access to government proceedings, which is at issue here.

Alternatively, the government emphasizes the fact that no courts have recognized a First Amendment right of access to deportation proceedings. While this may be so, this observation neither negates such a right nor provides a basis for departing from the *Richmond Newspapers* experience and logic test. To the contrary, this test has been applied time and again to extend the recognition of public rights to access proceedings beyond the trial phase. *See Press–Enterprise I,* 464 U.S. at 501–04, 104 S.Ct. 819 (voir dire examination and juror selection); *Press Enterprise II,* 478 U.S. at 13, 106 S.Ct. 2735 (preliminary hearings); *United States v. Smith,* 787 F.2d 111, 116 (3d Cir.1986) (transcripts of sidebars or chambers conferences concerning evidentiary rulings); *United States v. Criden,* 675 F.2d 550, 554 (3d Cir.1982) (pretrial suppression, due process and en-

trapment hearings); *United States v. Simone,* 14 F.3d 833, 842 (3d Cir.1994) (post-trial examination of juror for potential misconduct). More importantly, the *Richmond Newspapers* test has been applied to particular proceedings outside the criminal judicial context. *Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059 (3d Cir.1984) (extending *Richmond Newspapers* rationale to civil trials); *Whiteland Woods, L.P. v. West Whiteland,* 193 F.3d 177, 181 (3d Cir.1999) (applying test to find right of access to municipal planning meeting); *Cal–Almond, Inc. v. United States Dept. of Agriculture,* 960 F.2d 105, 109 (9th Cir. 1992) (applying test to administrative voter list); *Society of Prof. Journalists v. Secretary of Labor,* 616 F.Supp. 569, 574 (D.Utah 1985) (applying test to administrative hearing). Accordingly, the Court will assess whether plaintiffs enjoy a First Amendment right of access to deportation hearings under the standard of *Richmond Newspapers* and its progeny.

#### b. Applying the Richmond Newspapers Standard

##### (1) The "History of Openness" Prong

In assessing a history of openness in deportation, the Court begins with the observation that the first immigration statute in this country was enacted in 1875. *INS v. St. Cyr,* 533 U.S. 289, 305, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Although the openness of deportation proceedings, as opposed to exclusion proceedings, has not been the subject of a statutory provision, in 1903 the Supreme Court held that due process rights attached to proceedings to remove a resident alien, the touchstone of which is the right to an open hearing. *The Japanese Immigrant Case,* 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903). Thus, from 1903 onward, hearings that comport with due process have been an element of deportation. Furthermore, since 1964, federal regulations have expressly provided a pre-

sumption of openness for deportation proceedings. 8 C.F.R. § 242.16(a) (1964); 8 C.F.R. § 3.27 (2002). This stands in contrast to longstanding statutes that have provided affirmatively that *exclusion* proceedings are tó be "kept separate and apart from the public." *Immigration Laws and Regulations,* Article 6, at 4 (Mar. 11, 1893); Act of Mar. 3, 1903, ch. 1012, 32 Stat. 1213 (1903); Immigration and Nationality Act of 1952 ("INA"), 66 Stat. 163, § 236(a) (1952). The foregoing demonstrates a history of openness in *deportation* proceedings that points favorably toward finding a public right of access.

Alternatively, even assuming, as the government contends, that there has been no clear showing of a history of openness attendant to deportation proceedings, there is certainly no tradition of their presumptive closure. These circumstances implicate the cases in which the Third Circuit has recognized a First Amendment right of access despite the absence of a history of openness. For instance, in *United States v. Simone,* 14 F.3d 833 (3d Cir.1994), the newspaper plaintiffs sought access to closed judicial examinations of jurors to investigate alleged misbehavior. Applying the *Richmond Newspapers* test, the court of appeals found that the juror misconduct proceedings at issue had neither a clear history of openness nor one of closure. Accordingly, the court of appeals concluded that "on the whole, the 'experience' prong of the 'logic and experience' test provides little guidance in this case." (*Id.* at 838). Under the circumstances, it was appropriate to determine the existence of a right of access primarily by reference to the "logic" prong of the analysis. (*Id.*) Here, were the Court inclined to find that there had been no showing of historical openness in deportation proceedings, it would nevertheless proceed to the "logic"

inquiry under the Third Circuit's decision in *Simone.*

### (2) The "Logic" Prong

Concerning the "logic" prong, there is no doubt that deportation proceedings inherently involve a governmental process that affects a person's liberty interest and, as the Supreme Court has held, must comport with constitutional guarantees of due process. Thus, the ultimate individual stake in these proceedings is the same as or greater than in criminal or civil actions. Moreover, the proceedings have undeniable similarities to judicial proceedings. For instance, at such hearings: the alien appears before an immigration judge; a list of charges is filed; the alien may be represented by counsel; the alien has an opportunity to examine evidence against him, to present evidence on his behalf and to cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). Thus, there are abundant similarities between these proceedings and judicial proceedings in the criminal and civil contexts. The parallels in both the nature of the right at stake and the character of the proceedings lead to the conclusion that the same functional goals served by openness in the civil and criminal judicial contexts would be equally served in the context of deportation hearings. Accordingly, the Court determines that there is a qualified right of public access to deportation hearings protected by the First Amendment.

### 3. *The Requirement that a Government Restriction of Right of Public Access be Narrowly Tailored to Serve Compelling Interest*

Under *Globe Newspaper*, government action that curtails a First Amendment right of access "in order to inhibit the disclosure of sensitive information" must be supported by a showing "that denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co.,* 457 U.S. at 606–607, 102 S.Ct. 2613.

■ The government's asserted interests in implementing the Creppy Memo fall into two categories: (1) avoidance of setbacks to its terrorism investigation caused by open hearings; and (2) prevention of stigma or harm to detainees that might result if hearings were open. These interests are supported by the declarations of James S. Reynolds, Chief of Terrorism and Violent Crimes Section of the Justice Department's Criminal Division, executed in pending Freedom of Information Act litigation, and Dale Watson, Executive Assistant Director for Counter Terrorism and Counterintelligence of the FBI. Much of these declarations describe the possible consequences if the names of "special interest" detainees and the circumstances of their arrests were disclosed to the public. For instance, such disclosure could: subject the detainees to harm or intimidation; deter them from cooperating in the event of their release; reveal the direction and progress of investigations; facilitate others in creating false or misleading evidence; reveal sensitive investigatory information. (Reynolds Cert., ¶¶ 14–17; Watson Cert., ¶¶ 11–23).

The problem with the Creppy Memo is that there is nothing in it to prevent disclosure of this very information by the "special interest" detainee or that individual's lawyer, both of whom are permitted to be present in the "special interest" proceedings. Furthermore, if an appeal is taken, the transcript of the proceedings below would be disclosed in any event. Therefore, by definition, the Creppy closure dictates are not narrowly tailored to serve the government's interests because they do not advance those interests. *Accord Detroit Free Press v. Ashcroft,* 195 F.Supp.2d 937 (E.D.Mich.2002). Moreover to the extent

that the Creppy Memo is said to serve the interest of insulating the individual detainee from humiliation or stigma, its mandates sweep too broadly because it does not permit the individual to elect such protective treatment. Surely this interest is co-extensive with the individual's preference to see it invoked, given that closure may be seen by some detainees as having a negative impact upon them and their interests. Finally, the Court is not persuaded that the more narrow method of *in camera* disclosure of sensitive evidence, if need for such a procedure is appropriate under the facts of a particular case, is not an acceptable means of avoiding a compromise of the government's investigation. For these reasons, the Creppy Memo is not narrowly tailored to serve the asserted government interests.

### 4. Conclusion

In sum, the Court determines that plaintiffs have demonstrated a reasonable likelihood of success on the merits of Count I. Correspondingly, the government has not demonstrated that Count I of the Complaint "fails to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6).[10]

10. *First Amendment Coalition v. Judicial Inquiry and Review Board,* 784 F.2d 467 (3d Cir.1986), heavily relied upon by the government, does not compel a different result here. That case does not support a blanket conclusion that administrative proceedings are not subject to a First Amendment right of access claim. If that were so, the lengthy discussion of access in that case, in several different opinions from the *en banc* court, would have been unnecessary. Under review in that case was a provision in the recently adopted Constitution of the Commonwealth of Pennsylvania which established a Judicial Inquiry and Review Board where proceedings were to be made public only at the point where judicial discipline was recommended. *First Amendment Coalition* is, therefore, distinguishable

### D. Count II: Plaintiffs' Claim for Violation of INS Regulations

■ In Count II of the Complaint, plaintiffs allege that the Creppy Memo violates the regulations pertaining to closure of deportation hearings, 8 C.F.R. §§ 3.27, 240.10(B). Section 240.10(b) governs removal proceedings and states that "[r]emoval hearings shall be open to the public, except that the immigration judge may, in his or her discretion, close proceedings as provided in § 3.27 of this chapter." 8 C.F.R. § 240.10(b). Section 3.27, in turn, provides in relevant part:

### § 3.27 Public access to hearings.

All hearings, other than exclusion hearings, shall be open to the public except that:

(a) Depending upon physical facilities, the Immigration Judge may place reasonable limitations upon the number in attendance at any one time with priority being given to the press over the general public;

(b) For the purpose of protecting witnesses, parties, or the public interest, the Immigration Judge may limit attendance or hold a closed hearing.

8 C.F.R. § 3.27. Plaintiffs assert that these regulations permit closure of deportation

on three bases. First, considerable deference was accorded to the provisions of a *state constitution,* (*id.* at 475), a situation not present here where an *administrative memorandum* of a *federal* agency is under review. Second, it was clear in that case that there was no history or tradition of openness in this newly-created supplement to the "cumbersome and ineffective" proceedings for judicial impeachment. (*Id.* at 473). Third, the inquiry in *First Amendment Coalition* was not whether these disciplinary proceedings should be closed entirely, but at what point along the time-line should there be public access and disclosure. (*Id.* at 474). In the case at bar, *First Amendment Coalition* does not dictate a decision in the defendants' favor.

proceedings only on a case-by-case basis upon the finding of the particular immigration judge that sufficient conditions exist to justify closure. Neither the regulations themselves nor their enabling statutes expressly provide a right of enforcement through a civil action for perceived violations. Therefore, the Court must address whether an implied right of enforcement exists.

In considering the question of implied right of action, the Court is guided by the recent decision of the Supreme Court in *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). In *Sandoval*, the Court considered whether there was a private enforcement right for Department of Justice regulations promulgated under section 602 of Title VI of the Civil Rights Act of 1964. In reaching the conclusion that there was no such right, the Court reaffirmed that the determinative factor in the inquiry is Congress' statutory intent to create a "freestanding" cause of action. (*Id.* at 286–87, 121 S.Ct. 1511, "Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.") Even when the inquiry is directed to an agency regulation, the analysis must focus squarely on the intent underlying the enabling statute. (*Id.* at 290–91, 121 S.Ct. 1511, rejecting the notion that the language of the regulation can conjure up a private right of action) ("Agencies may play sorcerer's apprentice but not the sorcerer himself.") As restated in *Sandoval*, congressional intent to create a private right of enforcement is disclosed by the language and structure of the statute. (*Id.* at 288–92, 121 S.Ct. 1511). The relevant issue in the present case, therefore, is whether the enabling statutes for 8 C.F.R. §§ 3.27 and 240.10(b) reveal the requisite intent. Plaintiffs obliquely refer to the provisions of 8 U.S.C. § 1229a, discussed

above in a different context, in support of their argument that an implied right of action exists under the regulations. As observed, § 1229a establishes certain protocols for removal proceedings, such as: requiring formal charges and the presence of the alien, entitling that individual to representation by counsel, granting an opportunity to present supportive evidence and examine contrary evidence, and similar requirements. 8 U.S.C. § 1229a. Although these provisions inject into the removal hearings elements that parallel judicial proceedings, *see supra*, they do not manifest an intent to create a right of action in favor of the public or press to enforce the presumption of openness embodied in the cited regulations. The language of § 1229a neither precludes nor affords the public a right of access. Though congressional intent to create such a right was not determinative in the Court's investigation into the tradition of openness that attends deportation proceedings, it is in the instant analysis. There being no manifestation of congressional intent to create a right in favor of the public to enforce 8 C.F.R. §§ 3.27 and 240.10(b), there can be no implied right of action to challenge the Creppy Memo on the ground that it collides with these provisions.

Plaintiffs rely heavily on *Pechter v. Lyons*, 441 F.Supp. 115 (S.D.N.Y.1977), to support their argument that a right of action is implied in this case. In *Pechter*, members of the general public challenged an immigration judge's decision to close deportation hearings on the basis of an INS regulation nearly identical to 8 C.F.R. § 3.27. As a threshold matter, the court found that the public had a right to pursue the cause of action under the regulation. Decided nearly 25 years before *Sandoval*, *Pechter* simply does not stand up against the recent decision in this area. The approach taken there was designed principal-

ly to advance the sound and recognized policy of openness in adjudications affecting liberty rights. Nevertheless, the court did not examine the enabling statute to determine whether it revealed the requisite congressional intent. Therefore, the approach taken in *Pechter* cannot be squared with the analysis compelled by *Sandoval.*

Plaintiffs maintain that the creation of an implied right would ensure that the procedures Congress enacted for removal hearings are administered properly. They further argue that there is no statement by Congress that negates an implied right of action. The Court's decision in *Sandoval* makes clear that neither of these considerations can overcome the absence of affirmative evidence of congressional intent to create a right of enforcement. *Sandoval,* 532 U.S. at 286–87, 121 S.Ct. 1511 ("Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.")

### III. PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE HARM, BALANCE OF HARMS, AND PUBLIC INTEREST.

#### A. Irreparable Harm

■ In order to be entitled to a preliminary injunction, the party seeking the injunction must demonstrate that irreparable harm will result if relief is denied. *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir.1999). "Generally, '[i]n a First Amendment challenge, a plaintiff who meets the first prong of the test for a preliminary injunction will almost certainly meet the second, since irreparable injury normally arises out of the deprivation of speech rights.'" *ACLU v. Reno,* 217 F.3d 162, 180 (3d Cir.2000); *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")

■ Plaintiffs seek to enjoin the operation of the Creppy Memo to the extent that it bars the press and public from deportation hearings designated as "special interest" cases without a particularized determination that closure is necessary to advance an important interest. The Court has determined that the Creppy Memo violates plaintiffs' right of access to these proceedings. Without an injunction, the government could continue to bar the public and press from deportation proceedings without any particularized showing of justification. This presents a clear case of irreparable harm to a right protected by the First Amendment.

#### B. Balance of Harms

The next step in the preliminary injunction analysis requires the Court to consider "whether granting preliminary relief will result in even greater harm to the nonmoving party." *Allegheny Inc.,* 171 F.3d at 158. There is no basis for finding that the harm caused to the government would outweigh the value achieved by enjoining a practice that violates the Constitution. Even if enforced, the Creppy Memo does not guarantee nondisclosure of the facts and proceedings which it addresses. Furthermore, even in the wake of an injunction barring the operation of the Creppy Memo, the government will be in the same position it occupied before the closure edict issued, that is, closure of deportation proceedings in specific individual cases will be attainable pursuant to the INS's own regulations. 8 C.F.R. §§ 3, 27, 240.10(b).

#### C. Public Interest

Finally, the Court must also determine "whether granting the preliminary relief

will be in the public interest." *Allegheny Inc.*, 171 F.3d at 158. "Curtailing constitutionally protected speech will not advance the public interest, and 'neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.' " *ACLU*, 217 F.3d at 180 (quoting *American Civil Liberties Union v. Reno*, 929 F.Supp. 824, 866 (E.D.Pa. 1996)). This principle is particularly significant when what is at stake in the action is the *public's own* right of access to deportation proceedings. Therefore, the issuance of a preliminary injunction enjoining the operation of the Creppy Memo is in the public interest. The countervailing interests advanced by the government regarding the impeding of terrorism are serious and legitimate, particularly in the wake of the dastardly attacks of September 11, 2001 and the continuing threat of their repetition. However, these concerns can be well served by addressing the need to close specific proceedings regarding particular deportees. Therefore, under the present circumstances the balancing of public interests also tips in favor of the plaintiffs and their First Amendment rights.

Because plaintiffs have demonstrated that each of the four prongs of the analysis favors the entry of a preliminary injunction, the Court will grant the requested relief.

### CONCLUSION

Defendants' motion to dismiss for lack of subject matter jurisdiction was withdrawn at oral argument. Defendants' motion to dismiss the Complaint for failure to state a claim is granted in part and denied in part. Plaintiffs' motion for a preliminary injunction is granted. The form of injunctive order submitted by the plaintiffs is appropriate; therefore, the Court has executed and filed that order with this Opinion, together with its own order addressing the defendants' motions.

### ORDER

For the reasons set forth in the Court's Opinion filed herewith,

It is, on this 28th day of May, 2002, **ORDERED** that:

(1.) Defendants' motion to dismiss the Complaint for lack of subject matter jurisdiction was withdrawn and, therefore, that motion is itself dismissed.

(2.) Defendants' motion to dismiss the Complaint for failure to state a claim is granted in part and denied in part.

**THIS MATTER** having been opened to the Court by Plaintiffs North Jersey Media Group, Inc. and New Jersey Law Journal, through its above-captioned attorneys, by way of Complaint, declarations, Order to Show Cause, and Brief in Support of Its Application for Order to Show Cause and Preliminary Injunction, and the Court having set the return date on the Order to Show Cause for April 5, 2002, and Defendants John Ashcroft and Hon. Michael Creppy, by and through their counsel, opposing said application for injunctive relief, and the Court hearing arguments of counsel on April 5, 2002, and the Court having found good cause for the entry of a preliminary injunction;

**IT IS** on this 28th day of May, 2002;

**ORDERED** that during the pendency of this action and until further Order of this Court, Defendants are hereby enjoined and restrained from enforcing the Creppy Memo; and it further

**ORDERED** that during the pendency of this action and until further Order of this Court, Defendants are hereby enjoined and restrained from closing to the public any immigration proceedings in the absence of case-specific findings demonstrat-

ing that closure is narrowly tailored to serve a compelling governmental interest in closure; and it is further

**ORDERED** that a copy of this Order shall be circulated within 7 days hereof.