

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-8-2002

# North Jersey Media v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 02-2524

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"North Jersey Media v. Atty Gen USA" (2002). *2002 Decisions*. Paper 639.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/639

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 8, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2524

NORTH JERSEY MEDIA GROUP, INC.;
NEW JERSEY LAW JOURNAL

v.

JOHN ASHCROFT, Attorney General
of the United States; MICHAEL CREPPY, HON.

John Ashcroft, Attorney General of the
United States and Michael Creppy, Chief
Immigration Judge of the United States, Appellants

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 02-cv-00967)
District Judge: Honorable John W. Bissell, Chief Judge

Argued: September 17, 2002

Before: BECKER, Chief Judge, SCIRICA and
GREENBERG, Circuit Judges.

(Filed: October 8, 2002)


ROBERT D. McCALLUM, JR.,
 ESQUIRE
Assistant Attorney General
CHRISTOPHER J. CHRISTIE,
 ESQUIRE
United States Attorney
GREGORY G. KATSAS, ESQUIRE
 (ARGUED)
Deputy Assistant Attorney General
SHARON SWINGLE, ESQUIRE
ROBERT M. LOEB, ESQUIRE
Attorneys, Appellate Staff
United States Department of Justice
Civil Division, Appellate Staff
601 D Street, NW
Washington, DC 20530-0001

Counsel for Appellants

STEVEN R. SHAPIRO, ESQUIRE
LUCAS GUTTENTAG, ESQUIRE
LEE GELERNT, ESQUIRE (ARGUED)
American Civil Liberties
 Union Foundation

Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004

LAWRENCE S. LUSTBERG,
  ESQUIRE
SHAVAR D. JEFFRIES, ESQUIRE
Gibbons, Del Deo, Dolan,
  Griffinger & Vecchione
One Riverfront Plaza
Newark, NJ 07102-5497

EDWARD BAROCAS, ESQUIRE
American Civil Liberties Union of
  New Jersey Foundation
35 Halsey Street, Suite 4B
Newark, NJ 07102

DAVID COLE, ESQUIRE
Georgetown University Law Center
60 New Jersey Avenue, NW
Washington, DC 20001

NANCY CHANG, ESQUIRE
SHAYANA D. KADIDAL, ESQUIRE
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012-2317

Counsel for Appellees

DAVID A. SCHULZ, ESQUIRE
Clifford, Chance, Rogers & Wells
200 Park Avenue
New York, NY 10166

Counsel for Amicus-Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

This civil action was brought in the District Court for the District of New Jersey by a consortium of media groups seeking access to "special interest" deportation hearings involving persons whom the Attorney General has determined might have connections to or knowledge of the September 11, 2001 terrorist attacks. This category was created by a directive issued by Michael Creppy, the Chief United States Immigration Judge, outlining additional security measures to be applied in this class of cases, including closing hearings to the public and the press. Named as defendants in the suit were Attorney General John Ashcroft and Chief Judge Creppy. The District Court found for the media plaintiffs and issued an order enjoining the Attorney General from denying access, from which he now appeals.

The District Court's order was accompanied by an opinion which provides the framework for this appeal, at the heart of which lay a number of conclusions. First, the Court held that the case was governed by the test

3

developed in Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980), a murder case in which the trial judge had ordered that the courtroom be cleared of all persons except witnesses. In striking down the closure order, the Supreme Court noted an "unbroken, uncontradicted history" of public access to criminal trials in Anglo American law running from "before the Norman Conquest" to the present. It emphasized that it had not found "a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country." Id. at 565-73. The Supreme Court held that the right of the press and public to attend criminal trials "is implicit in the guarantees of the First Amendment." Id. at 580. While the Court acknowledged the State's argument that the Constitution nowhere explicitly guarantees the public's right to attend criminal trials, it nonetheless held the right implicit due to the fact that the Framers drafted the Constitution against a backdrop of popular access.

In its opinion in this case, the District Court rejected the Government's argument that administrative hearings in general, and deportation hearings in particular, are not subject to the Richmond Newspapers two-part "experience and logic" test because they are of a fundamentally different nature. Instead, the Court applied that test, which asks first whether a particular proceeding has a history of openness, and then whether openness plays a positive role in that proceeding. With respect to the experience inquiry, the District Court relied especially on a line of Third Circuit cases which has applied Richmond Newspapers to find access to a number of auxiliary criminal proceedings, as well as to civil cases. The Court also relied on two cases in which we applied Richmond Newspapers to determine whether access should be granted to administrative proceedings, although we concluded in each instance that there was no access. In short, the District Court reasoned that these cases supported application of Richmond Newspapers, and, applying Richmond Newspapers, found that there was a sufficient history of open deportation proceedings to satisfy the Richmond Newspapers experience test.

Turning to the logic prong, the District Court held that policy considerations strongly favored media access.

4

Significantly, however, in evaluating the logic prong, the Court did not consider the policies militating against media access, including those identified in a declaration filed by

Dale Watson, Counterterrorism Chief of the Federal Bureau of Investigation, which explained the danger of security breaches entailed in opening the hearings. In brief, the Watson Declaration represents that insight gleaned from open proceedings might alert vigilant terrorists to the United States' investigative tactics and could easily betray what knowledge the government does -- or does not-- possess. Watson submits that even details that seem innocuous in isolation, such as the names of those detained, might be pieced together by knowledgeable persons within the terrorist network, who could in turn shift activities to a yet-undiscovered terrorist cell. Because immigration judges cannot be expected accurately to assess the harm that might result from disclosing seemingly trivial facts, Watson explains, seeking closure on a case-by-case basis would ineffectively protect the nation's interests.

Although existing caselaw on the logic prong has discussed only the policies favoring openness, we are satisfied that the logic prong must consider the flip side of the coin. Indeed, the Supreme Court seems to have contemplated this, for in formulating the Richmond Newspapers test it asked "whether public access plays a significant positive role in the functioning of the particular process in question." Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8 (1986) (emphasis added). Any inquiry into whether a role is positive must perforce consider whether it is potentially harmful. The District Court, however, failed to consider the Watson Declaration under its logic inquiry, examining it only in conjunction with the Newspapers' argument that the Creppy Directive failed strict scrutiny, a position that it endorsed.

While we believe that the notion that Richmond Newspapers applies is open to debate as a theoretical matter, we must yield to the prior precedent of this Court, and hence will apply it to the facts. We note, however, that we are not bound by dicta in those decisions, including the most far reaching, Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d 177 (3d Cir. 1999), which we discuss at length infra.

5

The only Circuit to deal with these issues has resolved them in favor of the media. See Detroit Free Press v. Ashcroft, 2002 U.S. App. LEXIS 17646 (6th Cir. 2002). However, we find ourselves in disagreement with the Sixth Circuit. In our view the tradition of openness of deportation proceedings does not meet the standard required by Richmond Newspapers, or even its Third Circuit progeny. Deportation procedures have been codified for approximately 100 years but, despite their constant reenactment during that time, Congress has never explicitly guaranteed public access. Indeed, deportation cases involving abused alien children are mandatorily closed by statute, and hearings are often conducted in places generally inaccessible to the public. While INS regulations promulgated in 1964 create a rebuttable presumption of

openness for most deportation cases, we conclude that a recently-created regulatory presumption of openness with significant statutory exceptions does not present the type of "unbroken, uncontradicted history" that Richmond Newspapers and its progeny require to establish a First Amendment right of access.

The most difficult case for the government is FMC v. South Carolina State Ports Authority, 122 S. Ct. 1864 (2002). In holding that state sovereign immunity bars an administrative agency from adjudicating a private party's complaint against a nonconsenting state, the Supreme Court recognized that "formalized administrative adjudications were all but unheard of " during the Framers' time. Id. at 1872. It nevertheless found that because Federal Maritime Commission adjudications so strongly resemble civil suits, they "are the type of proceedings from which the Framers would have thought the States possessed immunity when they agreed to enter the Union," id., and it concluded that state sovereign immunity applies.

We recognize that, at least since the 1960s, formalized deportation proceedings have borne an undeniable procedural resemblance to civil trials, and that, read broadly, Ports Authority's language might therefore suggest that the same First Amendment rights exist in each context. While we find the issue debatable, as we explain more extensively infra, we believe that Ports Authority's

6

approach was inextricably tied to its underlying premise that sovereign immunity shields nonconsenting states from complaints brought by private persons, regardless of where private persons bring those complaints. In contrast, we find that there has never been a fundamental right of access to all government proceedings. Even today, many are closed by statute, including such frequent and important matters as Social Security hearings. Without a fundamental right of access comparable to nonconsenting states' right to freedom from private claims, we decline to loose Ports Authority from its Eleventh Amendment moorings.

We also disagree with the Sixth Circuit as to the import of the Richmond Newspapers logic prong. We note preliminarily that, in the jurisprudence developed thus far, the logic prong does not appear to do much work in the Richmond Newspapers approach, for we have not found a case in which a proceeding passed the experience test through its history of openness yet failed the logic test by not serving community values. Under the reported cases, the second prong of the Richmond Newspapers test has been applied to inquire whether openness plays a positive policy role in a given proceeding. But, as we have explained, that calculus perforce must take account of the flip side -- the extent to which openness impairs the public good.

This case arises in the wake of September 11, 2001, a day on which American life changed drastically and

dramatically. The era that dawned on September 11th, and the war against terrorism that has pervaded the sinews of our national life since that day, are reflected in thousands of ways in legislative and national policy, the habits of daily living, and our collective psyches. Since the primary national policy must be self-preservation, it seems elementary that, to the extent open deportation hearings might impair national security, that security is implicated in the logic test. When it is factored in, given due consideration to the attorney general's statements of the threat, we do not believe that the Richmond Newspapers logic prong test favors the media either.

As we will now explain in detail, we find that the application of the Richmond Newspapers experience and logic tests does not compel us to declare the Creppy

7

Directive unconstitutional. We will therefore reverse the Order of the District Court.

I. BACKGROUND

A. The Creppy Directive

Shortly after the attacks of September 11, 2001, the President ordered a worldwide investigation into those atrocities and related terrorist threats to the United States. Over the course of this ongoing investigation, the government has become aware of numerous aliens who are subject to removal from the United States for violating immigration laws. The Immigration and Naturalization Service has detained and initiated removal proceedings against many of these individuals.

The Department of Justice, which oversees the INS, has identified some aliens whose situations are particularly sensitive and designated their hearings "special interest" cases. According to Dale L. Watson, the FBI's Executive Assistant Director for Counterterrorism and Counterintelligence, the designated aliens "might have connections with, or possess information pertaining to, terrorist activities against the United States." (Watson Dec.) For example, special interest cases include aliens who had close associations with the September 11 hijackers or who themselves have associated with al Qaeda or related terrorist groups.

The Department of Justice has reviewed these designations periodically and removed them in many cases that it determined were less sensitive than previously believed. For those cases that retain the "special interest" designation, however, Chief Immigration Judge Creppy issued a memorandum (the "Creppy Directive") implementing heightened security measures.1 The Directive

_____

1. The Immigration and Nationality Act charges the Attorney General

with the "administration and enforcement" of "all [ ] laws relating to the immigration and naturalization of aliens." 8 U.S.C. S 1103(a) (1994). The Act authorizes the Attorney General to remove aliens from the United States for various reasons, including violation of the immigration laws.

requires immigration judges "to close the hearing[s] to the public, and to avoid discussing the case[s] or otherwise disclosing any information about the case[s] to anyone outside the Immigration Court." It further instructs that "[t]he courtroom must be closed for these cases -- no visitors, no family, and no press," and explains that the restriction even "includes confirming or denying whether such a case is on the docket or scheduled for a hearing." In short, the Directive contemplates a complete information blackout along both substantive and procedural dimensions.

In closing special interest deportation hearings, the Government's stated purpose is to avoid disclosing potentially sensitive information to those who may pose an ongoing security threat to the United States and its interests. The Government represents that "if evidence is offered about a particular phone number link between a detainee and a number connected to a terrorist organization or member," the terrorists "will be on notice that the United States is now aware of the link" and "may even be able to determine what sources and methods the United States used to become aware of that link." (Watson Declaration.) Equally important, however, is "information that might appear innocuous in isolation [but that] can be fit into a bigger picture by terrorist groups in order to thwart the Government's efforts to investigate and prevent terrorism." (Id.) For example, information about how and

_____

Id. at S 1231. It also permits him to prescribe "such regulations . . . as he deems necessary for carrying out his authority," id. at S 1103(a)(3), and provides for removal proceedings to be conducted by immigration judges within the Executive Branch "under regulations prescribed by the Attorney General." Id.

Pursuant to this authority, the Attorney General in 1964 promulgated a regulation governing public access to removal and other administrative hearings that has remained substantially unchanged. It mandates the closure of certain hearings, such as those involving abused alien children, and permits the closure of all other hearings to protect "witnesses, parties, or the public interest." 8 C.F.R. 3.27 (2002) (modern codification). The Creppy Directive was issued pursuant to this regulation.

why special interest aliens were detained "would allow the terrorist organizations to discern patterns and methods of investigation"; information about how such aliens entered the country "would allow the terrorist organization to see

patterns of entry, what works and what doesn't"; and
information "about what evidence the United States has
against members of a particular cell collectively" would
reveal to the terrorist organization which of its cells have
been significantly compromised. (Id.)

The Government offers a litany of harms that might flow
from open hearings. Most obviously, terrorist organizations
could alter future attack plans, or devise new, easier ways
to enter the country through channels they learn are
relatively unguarded by the Department of Justice. They
might also obstruct or disrupt pending proceedings by
destroying evidence, threatening potential witnesses, or
targeting the hearings themselves. Finally, if the
government cannot guarantee a closed hearing, aliens
might be deterred from cooperating with the ongoing
investigation. See infra.

B. Present Litigation

From November 2001 to February 2002, reporters for the
New Jersey Law Journal and Herald News ("the
Newspapers") were repeatedly denied docket information for
and access to deportation proceedings in Newark's
Immigration Court. On March 6, 2002, the Newspapers
filed a federal court challenge to the Creppy Directive,
asserting that its mandated policy of closing every"special
interest" case precluded the case-by-case treatment the
First Amendment requires. They argued not only that
individualized inquiries are proper and practical, but also
that because the Directive permits special interest
detainees themselves to disseminate information concerning
their proceedings, its veil of secrecy is ineffective at best.[2]

_____

2. Although the Creppy Directive did not itself prohibit aliens and their
counsel from themselves disclosing information about special interest
hearings, a recently promulgated regulation authorizes immigration
judges to issue protective orders and seal records as necessary to protect
sensitive "law enforcement or national security information." See 67 Fed.
Reg. 36799, 36799 (May 28, 2002). As this regulation took effect on the
day the District Court rendered its decision, it played no role in that
opinion.

The District Court applied the two-part First Amendment
analysis set forth in Richmond Newspapers, Inc. v. Virginia,
448 U.S. at 555, and found that since the promulgation of
the modern immigration regulations, see 8 C.F.R.
S 242.16(a) (1964), there has been a "presumption of
openness for deportation proceedings," or at a minimum,
there has been "no tradition of their presumptive closure."
North Jersey Media Group, Inc. v. Ashcroft, 205 F.Supp. 2d
288, 300 (May 28, 2002). It held that this history of
presumed openness, coupled with the "abundant
similarities" between deportation proceedings and judicial
proceedings in the criminal and civil contexts, supported
the existence of a First Amendment right of access. Id. at

301. It further held that because the Creppy Directive's closures were categorical rather than narrowly-tailored, it failed strict scrutiny. The District Court accordingly granted the Newspapers' motion and temporarily enjoined the Directive's operation, although it left open the possibility of seeking closure in individual cases.

In a subsequent order, the District Court denied the Government's motion for a stay pending appeal, and it clarified that its injunction has nationwide scope, applies to all proceedings regardless of whether plaintiffs seek to attend, and requires proceedings to be open to all members of the press and public. (Proceeding of June 5, 2002.) On June 17, 2002, this Court granted expedited review of the Government's appeal but denied a stay. A week later, however, the Supreme Court granted a stay of the District Court's injunction pending the final disposition of this appeal. We note jurisdiction pursuant to 28 U.S.C.S 1331 and 28 U.S.C. S 1292(a)(1), and exercise plenary review over the District Court's legal conclusion that the First Amendment guarantees a right of access to deportation proceedings. See Rose Art Indus., Inc. v. Swanson, 235 F.3d 165 (3d Cir. 2000).

II. APPLICABILITY OF RICHMOND NEWSPAPERS

In finding a First Amendment right of access to deportation hearings, the District Court employed the two-part test set forth in Richmond Newspapers and its progeny. The Government contends that the Richmond

11

Newspapers test, developed as it was for criminal trials, has no proper application outside the judicial realm. It argues in the alternative that even if Richmond Newspapers provides the appropriate analytical framework, deportation proceedings cannot run its "experience and logic" gauntlet.

While we agree with the District Court's conclusion that Richmond Newspapers analysis is proper in the administrative context, we disagree with its application and hold that under that test, there is no First Amendment right to attend deportation proceedings.

A. Applicability to Article III Proceedings

In Richmond Newspapers, 448 U.S. at 555, the Supreme Court held that the press and public possess a First Amendment right to attend criminal trials. In that seminal case, the police arrested a man and tried him for murder. During his fourth trial (the first had been reversed on appeal, and the second and third were declared mistrials), the defendant's counsel moved that it be closed to the public so as to avoid yet another instance of jury contamination. The prosecutor had no objection, so the judge ordered "that the Courtroom be kept clear of all parties except the witnesses when they testify." Id. at 560. Two newspaper reporters sought to vacate the closure order

on First Amendment grounds, arguing that the court had made no evidentiary findings prior to issuing its order and also had failed to consider other, less drastic measures within its power to ensure a fair trial.

The Supreme Court held that as "[t]he Bill of Rights was enacted against the backdrop of the long history of trials being presumptively open," id. at 575, the right of the press and public to attend criminal trials "is implicit in the guarantees of the First Amendment." Id. at 580. It therefore struck down the closure order. Critical to the Court's holding was evidence of an "unbroken, uncontradicted history" of public access to criminal trials in Anglo American law running from "before the Norman Conquest" to the present, and it emphasized that it had not found "a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country." Id. at 565-73.

12

The Court also explained that this tradition of openness was no "quirk of history"; rather, it had long been recognized as an indispensable attribute of the trial process. Id. at 569. The open trial "gave assurance that the proceedings were conducted fairly to all concerned, and it discouraged perjury, the misconduct of participants, and decisions based on secret bias or partiality." Id. Equally important was its prophylactic effect, which discouraged vigilantism by "providing an outlet for community concern, hostility, and emotion." Id. at 571.

The Richmond Newspapers First Amendment right of access to criminal trials, therefore, stemmed from an "uncontradicted history, supported by reasons as valid today as in centuries past." Id. at 573. In his pragmatic concurrence, Justice Brennan concluded that:

> [T]wo helpful principles may be sketched. First, the case for a right of access has special force when drawn from an enduring and vital tradition of public entree to particular proceedings or information. Such a tradition commands respect in part because the Constitution carries the gloss of history. More importantly, a tradition of accessibility implies the favorable judgment of experience. Second, the value of access must be measured in specifics. Analysis is not advanced by rhetorical statements that all information bears upon public issues; what is crucial in individual cases is whether access to a particular government process is important in terms of that very process.

Id. at 589.

Despite Justice O'Connor's admonition that Richmond Newspapers does not have "any implications outside the context of criminal trials," Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 611 (1982), a majority of the Court has since adopted Justice Brennan's language as a test of

at least somewhat broader application. In Press-Enterprise Co. v. Superior Court, 478 U.S. at 1 (Press-Enterprise II), the Court held that there is a First Amendment right of access to preliminary hearings. Id. at 13. In so doing, it formalized what has come to be known as the Richmond Newspapers "experience and logic" test:

13

> First, because a tradition of accessibility implies the favorable judgment of experience, we have considered whether the place and process have historically been open to the press and general public. . . . Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question.

Id. at 8 (citations omitted). The Court recognized that "[t]hese considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes." Id. at 9. Nevertheless, it made clear that relation is not tantamount to equivalence, and it independently applied both prongs of the test to preliminary proceedings.

The Court first noted that, like criminal trials, pretrial proceedings had long been "conducted before neutral and detached magistrates [and had] been open to the public." Id. at 10. Indeed, during Aaron Burr's trial for treason in 1807, Chief Justice Marshall conducted a probable-cause hearing in the Hall of the House of Delegates in Virginia, the courtroom being too small to accommodate the throng of interested citizens. Id. Although several states had allowed preliminary hearings to be closed on the motion of the accused, even in these states they had been presumptively open and were closed only for cause shown. See id. at n.3. The Court therefore concluded that open preliminary hearings had been accorded the favorable judgment of experience. Id. at 11 (citation omitted). It then asked whether public access played a "particularly significant positive role" in pretrial proceedings, and found in the affirmative. "Because of its extensive scope, the preliminary hearing is often the final and most important step in the criminal proceeding." Id. at 12. In fact, in many cases the preliminary hearing provides "the sole occasion for public observation of the criminal justice system," and the absence of a jury "makes the importance of public access . . . even more significant." Id. at 12-13. Because preliminary hearings passed both parts of the Richmond Newspapers test, the Court found that the public has a First Amendment right of access in that context. It had reached the same conclusion regarding voir dire

14

examinations in Press-Enterprise Co. v. Superior Court, 464 U.S. 501 (1984) (Press-Enterprise I).

Given that a majority of the Supreme Court has applied
the Richmond Newspapers framework to pretrial
proceedings and voir dire examinations, that approach
clearly is not confined to the criminal trial itself, although
each of the Supreme Court's applications has arisen in the
criminal context. This Court has been less reticent in its
extensions. First, in Publicker Industries, Inc. v. Cohen, 733
F.2d 1059 (3d Cir. 1984), we applied Richmond Newspapers
and held that the First Amendment implicitly incorporates
a right of access to civil trials. Our conclusion rested on the
finding that "the public's right of access to civil trials and
records is as well established as that of criminal
proceedings and records," id. at 1066, and we noted that
"[a]s early as 1685, Sir John Hawles commented that open
proceedings were necessary so that truth may be
discovered in civil as well as criminal matters." Id. at 1067
(citation omitted). We then found that, under the logic
prong, openness has similar salutary effects in civil and
criminal trials, and concluded that the same First
Amendment right of access extends to each.3 Id. at 1070.

B. Applicability of Richmond Newspapers to
        Administrative Proceedings

The Government contends that while Richmond
Newspapers properly applies to civil and criminal
proceedings under Article III, the Constitution's text
militates against extending First Amendment rights to non-
Article III proceedings such as deportation. Its premise is
one of expressio unius est exclusio alterius:  Article III is
silent on the question of public access to judicial trials, but

------

3. Although the Supreme Court has not addressed the right to attend
civil trials, each Court of Appeals to examine this question has
concluded that Richmond Newspapers applies and that a First
Amendment right exists. See, e.g., Westmoreland v. CBS, 752 F.2d 16,
23 (2d Cir. 1984); Rushford v. New Yorker Magazine, 846 F.2d 249 (4th
Cir. 1988); Brown & Williamson Tobacco Co. v. Federal Trade
Commission, 710 F.2d 1165 (6th Cir. 1983); In re Continental Illinois
Securities Litigation, 732 F.2d 1302 (7th Cir. 1984); Newman v. Graddick,
696 F.2d 796 (11th Cir. 1983).

15

the Sixth Amendment expressly incorporates the common
law tradition of public trials, thus supporting the notion
that the First Amendment likewise incorporates that
tradition for Article III purposes. (Gov't Brief at 21-22.)
Articles I and II, conversely, do address the question of
access, and they do not provide for Executive or Legislative
proceedings to be open to the public.4  To the Government,
the absence of an explicit guarantee of access for Article I
and II proceedings (as exists in Article III) gives rise to a
distinction with a difference because, without an
incorporating provision parallel to the Sixth Amendment,
the Framers must have intended to deny the public access
to political proceedings.

The Government's suggestion is ultimately that we should not apply Richmond Newspapers where the Constitution's structure dictates that no First Amendment right applies, and should instead let the political branches (here, the Executive, acting through the Justice Department) determine the proper degree of access to administrative proceedings. See Capital Cities Media, Inc. v. Chester, 797 F.2d 1164, 1168 (3d Cir. 1986) (in banc) (concluding that aside from limited requirements, the Constitution leaves to the democratic process the regulation of public access to the political branches).

Our own jurisprudence precludes this approach. In Publicker, for example, we found a First Amendment right to attend civil trials, proceedings to which the Sixth Amendment is entirely inapplicable. If an express provision were necessary to incorporate into the Bill of Rights the common law tradition of access to trials, Publicker would have come out the other way, a result the Government does not urge. Moreover, the Richmond Newspapers Court itself apparently did not view the Sixth Amendment as a critical

---

4. The only constitutionalized access requirement vis-a-vis the Executive is that the President "from time to time give to the Congress Information of the State of the Union." (U.S. Const. Art. II,S 3.) The Constitution also requires Congress to publish a "regular Statement and Account of the Receipts and Expenditures of all public Money," (U.S. Const. art. I, S 9, cl. 7), and instructs each House of Congress to publish a journal of proceedings from which it may withhold "such Parts as it may in [its] Judgment require Secrecy." (U.S. Const. art. I,S 5, cl. 3).

16

incorporating provision. That case's incorporation language states only that "[t]he Bill of Rights was enacted against the backdrop of the long history of trials being presumptively open." Richmond Newspapers, 448 U.S. at 575. There is no suggestion that the Sixth Amendment is crucial to the right of access; indeed, this passage merely states that the Framers assumed a common and established practice.

At all events, after Publicker, the Sixth Amendment cannot be the sole source of a First Amendment right of access, and our precedents likewise foreclose the Government's attempt to confine the Richmond Newspapers approach to the Article III context. In Capital Cities Media, 797 F.2d at 1164, we held that there was no First Amendment right of public access to the records of a state environmental agency, an administrative body. Although the Government makes much of our "no-access" conclusion, more important is our methodology, for we found no First Amendment right only after applying the Richmond Newspapers test. Reviewing the Supreme Court's relevant holdings, we summarized that "[t]he government may not close government proceedings which historically have been open unless public access contributes nothing of significant value to that process or there is a compelling state interest in closure and a carefully tailored resolution

of the conflict between that interest and First Amendment concerns." Id. at 1173.

Similarly, in First Amendment Coalition v. Judicial Inquiry & Review Board, 784 F.2d 467 (3d Cir. 1986), we examined a Pennsylvania law permitting access to records of the Judicial Inquiry and Review Board only if that Board recommended disciplinary measures against a judge in a particular case. Plaintiff, a free speech advocacy group, sought access to records of cases in which the Board did not recommend a punishment. We again applied Richmond Newspapers, though we found that "[t]hese administrative proceedings, unlike conventional criminal and civil trials, do not have a long history of openness," id.  at 472, and therefore upheld the state law against plaintiff 's First Amendment right-of-access claim.5 Most recently, in

_____

5. The Government submits that First Amendment Coalition actually stands for the opposite proposition: that we should not apply Richmond

Whiteland Woods, 193 F.3d at 177, we applied the Richmond Newspapers analysis to determine whether a citizen had a First Amendment right to videotape a Township Planning Commission meeting. As in Capital Cities Media and First Amendment Coalition , we denied the right but only after going through the two-step analysis. These precedents demonstrate that in this Court, Richmond Newspapers is a test broadly applicable to issues of access to government proceedings, including removal. In this one respect we note our agreement with the Sixth Circuit's conclusion in their nearly identical case. See Detroit Free Press v. Ashcroft, 2002 U.S. App. LEXIS 17646 (6th Cir. 2002). We now employ that test to determine whether the press and public have a First Amendment right to attend deportation hearings.

III. UNDER RICHMOND NEWSPAPERS, IS THERE A FIRST AMENDMENT RIGHT TO ATTEND DEPORTATION HEARINGS?

Richmond Newspapers requires that when a court assesses a claimed First Amendment right of access, it must "consider[ ] whether the place and process have historically been open to the press and general public . . . [and] whether public access plays a significant positive role in the functioning of the particular process in question."

_____

Newspapers to any administrative proceeding. It asserts that when we said "[t]hese administrative proceedings . . . do not have a long history of openness," our emphasis was on "proceedings." Such an emphasis would distinguish administrative proceedings from civil and criminal trials, and would imply that no administrative proceeding could make the historical showing necessary under Richmond Newspapers. But this interpretation is both incorrect and misplaced. It is incorrect because the prior sentence referred to the "fundamentally different procedures of

judicial disciplinary boards," id., so that when we said that "[t]hese administrative proceedings" lacked history, we clearly referred only to proceedings before judicial disciplinary boards and not to administrative proceedings generally. It is misplaced because even if the Government were correct that administrative proceedings generally lack history, that argument properly addresses the "experience" prong of the Richmond Newspapers test itself. Our immediate concern is the antecedent issue of whether to apply that test.

18

Press-Enterprise II, 478 U.S. at 8. This language seems to place the burden of proof on the party alleging a First Amendment right. While we acknowledge a current presumption of openness in most deportation proceedings, we find that this presumption has neither the pedigree nor uniformity necessary to satisfy Richmond Newspapers's first prong. We also conclude that under a logic inquiry properly acknowledging both community benefits and potential harms, public access does not serve a "significant positive role" in deportation hearings.

A. The "Experience" Test

1. Is there an historical right of access to government proceedings generally?

In Richmond Newspapers, 448 U.S. at 575, the Supreme Court acknowledged the State's argument that the Constitution nowhere explicitly guarantees the public's right to attend criminal trials, but it found that right implicit because the Framers drafted the Constitution against a backdrop of longstanding popular access to criminal trials. Likewise, in Publicker, 733 F.2d at 1059, we found a First Amendment right of access to civil trials because at common law, such access had been "beyond dispute."

The history of access to political branch proceedings is quite different. The Government correctly notes that the Framers themselves rejected any unqualified right of access to the political branches for, as we explained in Capital Cities Media, 797 F.2d at 1168-1171, the evidence on this point is extensive and compelling. We need not rescribe it here, but a few snippets are instructive. At the Virginia ratification convention, Patrick Henry was a leading opponent of government secrecy. He said of the publication clause: "[Congress] may carry on the most wicked and pernicious of schemes under the dark veil of secrecy. The liberties of a people never were, nor ever will be, secure, when the transactions of their rulers may be concealed from them." 3 Elliot's Debates at 169-70 (J. Elliot ed. 1881). Nevertheless, even Henry conceded that not all government activities should be publicized, particularly those related to "military operations or affairs of great consequence." Id. at

19

170. Thomas Jefferson agreed, noting that "[a]ll nations have found it necessary, that for the advantageous conduct of their affairs, some [executive] proceedings, at least, should remain known to their executive functionary only." Randall, 3 Life of Thomas Jefferson 211 (1858), reprinted in Wiggins, Freedom or Secrecy 67-68 (1964).

Congressional practice confirms that there is no general right of public access to governmental proceedings or information. The members of the First Congress did not open their own proceedings to the public -- the Senate met behind closed doors until 1794, and the House did likewise until after the War of 1812.6 See Watkins, Open Meetings under the Arkansas Freedom of Information Act, 38 Ark. L. Rev. 268, 271 & n.96. While both Houses thereafter opened floor deliberations, committee sessions remained closed and were not routinely opened to the public until the mid-1970s. Id. at 272. Even today, the Senate operates under a resolution limiting public access to "routine Senate records" for 20 years after their creation and to "sensitive records, such as investigative files" for 50 years after their creation, and each Senate committee retains the right to extend that access period for its own records. S. Rep. 474, 96th Cong. 2nd Sess., 126 Cong. Rec. S15209-10 (daily ed., Dec. 1, 1980). See generally Capital Cities Media, 797 F.2d at 1170-71.

This tradition of closing sensitive proceedings extends to many hearings before administrative agencies. For example, although hearings on Social Security disability claims profoundly affect hundreds of thousands of people annually, and have great impact on expenditure of government funds, they are open only to "the parties and to other persons the administrative law judge considers necessary and proper." 20 C.F.R. 404.944. Likewise, administrative disbarment hearings are often presumptively closed. See, e.g., 12 C.F.R. 19.199 (Office of Comptroller of Currency); 12 C.F.R. 263.97 (Federal Reserve Board of Governors). The Government lists more than a dozen other

---

6. Indeed, it is interesting to note that our democracy was created behind closed doors, as the delegates at the Constitutional Convention in Philadelphia in 1787 excluded the public from their proceedings.

20

examples of mandatorily or presumptively closed administrative proceedings. For instance, hearings on charges of wrongdoing may often be closed at the administrator's discretion for "good cause," to protect the "public interest," or under similar standards. See, e.g., 5 C.F.R. 185.132(d) (Office of Personnel Management); 10 C.F.R. 13.30(d) (Nuclear Regulatory Commission); 13 C.F.R. 142.21(d) (Small Business Administration); 28 C.F.R. 68.39(a) (Department of Justice); 31 C.F.R. 500.713(a) (Office of Foreign Asset Control); 38 C.F.R. 42.30(d) (Office of Veterans Affairs). Hearings on adverse passport decisions by the Department of State "shall be private." 22 C.F.R.

51.87. See also 5 C.F.R. 2638.505(e)(2) (hearings on ethics charges against government employees may be closed "in the best interests of national security, the respondent employee, a witness, the public or other affected persons"); 10 C.F.R. 1003.62(a) (hearings before Department of Energy Office of Hearings and Appeals may be closed at discretion of administrator).

Faced with this litany of administrative hearings that are closed to the public, the Newspapers cannot claim a general First Amendment right of access to government proceedings without urging a judicially-imposed revolution in the administrative state. They wisely avoid that tactic, at least directly.7 Instead they submit that, despite frequent closures throughout the administrative realm, deportation proceedings in particular boast a history of openness sufficient to meet the Richmond Newspapers requirement. We now assess that claim, and find that we disagree.

---

7. Although the Newspapers do not argue directly for a general right of access to government proceedings, they maintain that FMC v. South Carolina Ports Authority, 122 S.Ct. 1864 (2002), compels us to recognize the procedural similarities between civil trials and deportation hearings and extend the same access rights to each. We find that this contention turns, at least in part, on whether there is a fundamental right of access to government proceedings comparable to nonconsenting states' fundamental right to freedom from private suit. It is because we find no such comparable right that FMC does not bind us here. See discussion infra.

21

2. Is the history of open deportation proceedings sufficient to satisfy the Richmond Newspapers "experience" prong?

For a First Amendment right of access to vest under Richmond Newspapers, we must consider whether "the place and process have historically been open to the press and general public," because such a "tradition of accessibility implies the favorable judgment of experience." Press-Enterprise II, 478 U.S. at 8. Noting preliminarily that the question whether a proceeding has been "historically open" is only arguably an objective inquiry, we nonetheless find that based on both Supreme Court and Third Circuit precedents, the tradition of open deportation hearings is too recent and inconsistent to support a First Amendment right of access.

The strongest historical evidence of open deportation proceedings is that since the 1890s, when Congress first codified deportation procedures, "[t]he governing statutes have always expressly closed exclusion hearings, but have never closed deportation hearings."8 (Newspapers' Br. at 30-31.) In 1893, the Executive promulgated the first set of immigration regulations, which expressly stated that exclusion proceedings shall be conducted "separate from

the public." See Treasury Dept., Immigration Laws and Regulations 4 (Washington D.C., Gov't Printing Office 1893). Congress codified those regulations in 1903 and, since that

---

8. Although both exclusion and deportation hearings are now formally styled "removal" hearings, see Chi Thon Ngo v. INS, 192 F.3d 390, 394 & n.4 (3d Cir. 1999), significant differences exist between the two. Exclusion proceedings occur when an applicant seeks entry into the United States, whereas in deportation proceedings, the United States seeks to expel a person who has already gained such entry. The Supreme Court has consistently held that persons facing deportation possess far greater legal rights than those contesting exclusion. See Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953) ("[While] it is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law, . . . [a]n alien on the threshold of initial entry stands on a different footing."). For clarity, we refer throughout this opinion to deportation and exclusion, rather than removal.

time, it has repeatedly reenacted provisions closing exclusion hearings.9 In contrast, although Congress codified the regulations governing deportation proceedings in 1904 and has reenacted them many times since, it has never authorized the general closure that has long existed in the exclusion context.10

The Newspapers submit that under the rule of construction expressio unius est exclusio alterius,

---

9. See, e.g., Act of March 3, 1903 S 25 (Ch. 1012, 32 Stat. 1213); Act of February 20, 1907 S 25 (Ch. 1134, 34 Stat. 898); 1952 Immigration and Nationality Act, 66 Stat. 163, SS 236, 242 (same); Treasury Department, Immigration Laws and Regulations 3 (1893); Treasury Department, Immigration Laws and Regulations 3 (1895); Treasury Department, Immigration Laws and Regulations 3 (1898); Treasury Department, Immigration Laws and Regulations 3 (1900); Treasury Department, Immigration Laws and Regulations 3 (1902); Treasury Department, Immigration Laws and Regulations 3 (1903); Bureau of Immigration, Department of Commerce and Labor, Immigration Laws and Regulations 3, 9 (1904); Bureau of Immigration, Department of Commerce and Labor, Immigration Laws and Regulations 3 (1906); Bureau of Immigration and Naturalization, Department of Commerce and Labor, Immigration Laws and Regulations 34 (1907); Bureau of Immigration, Department of Labor, Immigration Laws; Rules of May 1, 1917, 33 (1919); 8 C.F.R. pts. 12 & 19 (1938); 8 C.F.R. pt. 150 (1941 Supp.); 12 Fed. Reg. 5108 (July 30, 1947); 8 C.F.R. pt. 130 (1949); 32 Fed. Reg. 9628 (1967) codified at 8 C.F.R. pt. 236 (1968).

10. See, e.g., Act of March 3, 1903 S 25 (Ch. 1012, 32 Stat. 1213); Act of February 20, 1907 S 25 (Ch. 1134, 34 Stat. 898); Act of May 10, 1920 (Ch. 174, 41 Stat. 593); Act of May 26, 1924 (Ch. 190, 43 Stat. 153); 1952 Immigration and Nationality Act, 66 Stat. 163,S 242; Bureau of Immigration, Department of Commerce and Labor, Immigration Laws and Regulations 3, 9 (1904); Bureau of Immigration and Naturalization,

Department of Commerce and Labor, Immigration Laws and Regulations 34 (1907); Bureau of Immigration, Department of Labor, Immigration laws; Rules of May 1, 1917, 33 (1919); 8 C.F.R. pt. 19 (1938); 8 C.F.R. pt. 150 (1941 Supp.); 9 Fed Reg. 11884 (Sept. 19, 1944) (amendment to INS regulations governing deportation hearings, codified at 8 C.F.R. pt. 150 (1944 Supp.)); 10 Fed Reg. 8096 (Aug. 1, 1945) (codified at 8 C.F.R. pt. 150 (1945 Supp)); 12 F3d Reg. 5114 (July 30, 1947) (codified at 8 C.F.R. pt. 150 (1947 Supp.)); 8 C.F.R. pt. 150 (1949); 17 Fed. Reg. 11512 (Dec. 19, 1952) (codified at 8 C.F.R. pt. 242 (1952)); 22 Fed. Reg. 9795 (Dec. 6, 1957) (codified at 8 C.F.R. pt. 242 (1958)); 22 Fed. Reg. 9519 (Nov. 28, 1957) (codified at 8 C.F.R. pt. 242 (1958)).

Congress's practice of closing exclusion proceedings while remaining silent on deportation proceedings creates a presumption that it intended deportation proceedings to be open. In support of this interpretation, they point out that the current Justice Department regulations provide explicitly that "[a]ll hearings, other than exclusion hearings, shall be open to the public except that . . . [f]or the purpose of protecting . . . the public interest, the Immigration Judge may limit attendance or hold a closed hearing." 8 C.F.R. 3.27. From this they conclude that the regulations state explicitly what the statutes had long said implicitly, namely that deportation hearings are to be open unless an individualized case is made for closure.

But there is also evidence that, in practice, deportation hearings have frequently been closed to the general public. From the early 1900s, the government has often conducted deportation hearings in prisons, hospitals, or private homes, places where there is no general right of public access.11 Even in recent times, the government has continued to hold thousands of deportation hearings each year in federal and state prisons. See H.R. Rep. No. 104-469, pt. I, at 124 (1996). Moreover, hearings involving abused alien children are closed by regulation no matter where they are held, and those involving abused alien spouses are closed presumptively. See 8 C.F.R. 3.27(c).

We ultimately do not believe that deportation hearings boast a tradition of openness sufficient to satisfy Richmond Newspapers. In Richmond Newspapers itself, the Court noted an "unbroken, uncontradicted history" of public

---

11. The Newspapers contend that there is no evidence that hearings conducted in hospitals, prisons, and private homes were closed to the public. The Sixth Circuit agreed, concluding that this evidence does not "even hint that the public could not attend a hearing [in these places] . . . . Certainly, one could imagine family and friends being present." Detroit Free Press, 2002 U.S. App. LEXIS 17646 at *68. While we agree it is possible that some select non-party individuals might have been present in such places, we are unwilling to assume that the general public enjoyed unfettered access, a clearly counter-intuitive suggestion, particularly since Richmond Newspapers, in asking whether "the place and process have historically been open," seems to place the burden of proof on the party claiming openness.

access to criminal trials in Anglo American law running from "before the Norman Conquest" to the present, and it emphasized that it had not found "a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country." 448 U.S. at 565, 572, 573 & n.9. Likewise, in Publicker, 733 F.2d at 1059, we found that access to civil trials at common law was "beyond dispute."

The tradition of open deportation hearings is simply not comparable. While the expressio unius distinction between exclusion and deportation proceedings is a tempting road to travel, we are unwilling effectively to craft a constitutional right from mere Congressional silence, especially when faced with evidence that some deportation proceedings were, and are, explicitly closed to the public or conducted in places unlikely to allow general public access. Although the 1964 Department of Justice regulations did create a presumption of openness, a recent -- and rebuttable -- regulatory presumption is hardly the stuff of which Constitutional rights are forged.

The Newspapers contend, quite correctly, that at least within the geographic confines of the Third Circuit, a showing of openness at common law is not required. See, e.g., United States v. Criden, 675 F.2d 550, 555 (3d Cir. 1982) (finding a right of access to pretrial hearings even though no right existed at common law); United States v. Simone, 14 F.3d 833, 838 (3d Cir. 1994) (finding a right although no history predated 1980); Whiteland Woods, 193 F.3d at 181, (finding a "tradition of accessibility" based on a recent statutory guarantee). We agree that under these decisions a 1000-year history is unnecessary, and that in some cases, largely limited to the criminal context, relatively little history is required. These cases do not, however, allow us to dispense with the Richmond Newspapers "experience" requirement where history is ambiguous or lacking, and to recognize a First Amendment right based solely on the "logic" inquiry.

In Criden, 675 F.2d at 552, the defendant requested that the court conduct in camera his pretrial motion to suppress evidence, and the court acquiesced. A reporter filed suit alleging a First Amendment right to view those proceedings.

As Criden arose before Press-Enterprise II formalized the Richmond Newspapers test, we were not bound to apply it, and we stated that:

> We do not think that historical analysis is relevant in determining whether there is a first amendment right of access to pretrial criminal proceedings. We recognize that, at common law, the public apparently had no

right to attend pretrial criminal proceedings. On the other hand, there was no counterpart at common law to the modern suppression hearing . . . . [W]e proceed to examine the current role of the first amendment and the societal interests in open pretrial criminal proceedings.

675 F.2d at 555. Although this language supports the Newspapers' contention that we have overlooked the experience requirement in certain cases, it does not bind us here. Criden arose in the criminal context, where First Amendment rights of access had been found many times previously. More importantly, in Criden we were not bound to apply the Richmond Newspapers test because in Richmond Newspapers itself, no approach commanded a majority, and the Court had not yet decided Press-Enterprise II. We are now obligated to apply that test, and we have recognized that "the role of history in the access determination" is "crucial." Capital Cities Media, 797 F.2d at 1174.

The Newspapers' reliance on our decision in Simone, 14 F.3d at 833, is similarly misplaced. The District Court believed that Simone allows us to find a First Amendment right based solely on the logic prong where there is"neither a clear history of openness nor one of closure," North Jersey Media, 205 F.Supp. 2d at 300, but this greatly overstates our holding. In assessing whether there is a right of access to post-trial examinations of jury misconduct, we noted that the only available evidence postdated 1980. We recognized that evidence "of such recent vintage[does] not establish a tradition of closure," Simone, 14 F.3d at 838, and concluded that "the 'experience' prong of the 'logic and experience' test provides little guidance." Id. We then found a right while focusing mainly on the logic prong, but critical to that giant step was our reflection that "[g]iven the

26

overwhelming historical support for access in other phases of the criminal process, we are reluctant to presume that the opposite rule applies in this case in the absence of a distinct tradition to the contrary." Id. (emphasis added). This logic effectively limits Simone's scope to the criminal context, or at least to those areas with "overwhelming historical support for access." As discussed supra, the tradition of public access in the administrative realm is inconsistent at best, so we must rigorously apply both prongs of the Richmond Newspapers test.

Finally, despite our potentially misleading language in Whiteland Woods, 193 F.3d at 177, that case has no proper application here. Whiteland Woods, a real estate developer, was denied permission to videotape a Township Planning Commission meeting, and it sued for access. Although we recognized that "[t]he primary issue on appeal is whether there is a federal constitutional right to videotape public meetings of a township planning commission," id. at 180 (emphasis added), we stated in passing that "[w]e have no

hesitation in holding Whiteland Woods had a constitutional right of access to the Planning Commission meeting." Id. at 180-81. As the Planning Commission never actually denied Whiteland Woods the access guaranteed by state law, however, our broad statement was dicta and we do not follow it here.

Although we are confident that our precedents do not allow us to find a First Amendment right of access to deportation hearings absent strong historical evidence, the Supreme Court's recent ruling in FMC v. South Carolina Ports Authority, 122 S.Ct. at 1864, gives us pause. In holding that state sovereign immunity bars an administrative agency from adjudicating a private party's complaint against a nonconsenting state, the Supreme Court recognized that "formalized administrative adjudications were all but unheard of " during the Framers' time. Id. at 1872. It nevertheless found that because Federal Maritime Commission adjudications "walk[ ], talk[ ], and squawk[ ] like a civil lawsuit," id. at 1873 (quoting the Court of Appeals decision), "they are the type of proceedings from which the Framers would have thought the States possessed immunity when they agreed to enter the Union."

27

Id. at 1872. The Court therefore concluded that state sovereign immunity applies to administrative proceedings.

Ports Authority had not been decided when the District Court heard this case, and the Newspapers now assert that it forces us to distinguish the procedures in deportation hearings from those in civil trials before finding that different rights exist in each context. Were this suggestion correct, we would indeed be hard pressed to find meaningful differences between the two types of proceedings. A deportation proceeding is commenced with a "Notice to Appear," see 8 C.F.R. S 239.1, a document strongly resembling a civil complaint. In turn, a respondent may proffer affirmative defenses. See Martinez-Montoya v. INS, 904 F.2d 1018 (5th Cir. 1990). As in a civil trial, a respondent has the right to be represented by counsel of his choosing, see 8 C.F.R. S 240.3, and has the right to be present during his hearing. See 8 U.S.C.S 1229a(b)(4). He or she is also guaranteed an opportunity to cross-examine witnesses and present evidence on his or her behalf. Id. While slight differences exist regarding such minor matters as the admissibility of hearsay evidence, we agree that on a procedural level, deportation hearings and civil trials are practically indistinguishable.

Despite these undeniable similarities, however, we do not believe that the Supreme Court intended in Ports Authority to import the full panoply of constitutional rights to any administrative proceeding that resembles a civil trial. The Court's reasoning was based fundamentally on its enduring presumption "that the Constitution was not intended to 'raise up' any proceedings against the States that were 'anomalous and unheard of when the Constitution was

adopted.' " Ports Authority, 122 S.Ct. at 1872 (quoting Hans v. Louisiana, 134 U.S. 1, 18 (1890)). Put slightly differently, the Court started from the premise that state sovereign immunity shields nonconsenting states from complaints brought by private persons, regardless of where private persons bring those complaints. It then concluded that since Federal Maritime Commission proceedings strongly resemble civil trials to which state sovereign immunity applies, the Framers would have intended the same right to freedom from private suit to apply in each context.

In contrast, there is no fundamental right to attend government proceedings underpinning the Newspapers' alleged right to attend deportation proceedings. See discussion supra. This is not a situation where the Framers contemplated a perfectly transparent government, only to have deportation proceedings, which they did not foresee, jeopardize that intended scheme. This is also not a situation involving allegations that the government assigned to an administrative agency a function that courts historically performed in order to deprive the public of an access right it once possessed. And most importantly, this is not a situation that risks affront to states'"residual and inviolable sovereignty," id. at 1870 (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)), the concern that motivated the Ports Authority Court. We therefore decline to loose the Ports Authority analysis from its Eleventh Amendment moorings. Instead of analogizing procedures, the proper approach is that developed in Richmond Newspapers, and as we have explained, under that test we find an insufficient tradition of openness to support the right.

3. Relaxing the Richmond Newspapers experience requirement would lead to perverse consequences.

As we have explained in detail supra, there is no fundamental right of access to administrative proceedings. Any such access, therefore, must initially be granted as a matter of executive grace.12 The Government contends that by relaxing the need for a "1000-year tradition of public access," (Gov't Br. at 35), we would permanently constitutionalize a right of access whenever an executive agency does not consistently bar all public access to a particular proceeding. We do not adopt this reasoning in its

_____

12. The Newspapers disagree, arguing that "the constitutional right of access under the First Amendment does not, and could not, turn on whether the legislature has chosen to supply that right." We believe this reasoning to be precisely backwards, for Richmond Newspapers requires a tradition of access before recognizing a constitutional right to that access. Given that order of events, there must perforce be a period of time during which access to a particular proceeding is not constitutionally compelled, although during that period the executive could, of course, grant access as a matter of grace.

entirety, for as we have discussed supra, we have sometimes found a constitutional right of access to proceedings that did not exist at common law. See, e.g., Simone, 14 F.3d at 837-40 (finding a public access right to post-trial jury examinations).

Nevertheless, we agree with the Government that a rigorous experience test is necessary to preserve the "basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 544 (1978). Were we to adopt the Newspapers' view that we can recognize a First Amendment right based solely on the logic prong if there is no history of closure, we would effectively compel the Executive to close its proceedings to the public ab initio or risk creating a constitutional right of access that would preclude it from closing them in the future. Under such a system, reserved powers of closure would be meaningless. It seems possible that, ironically, such a system would result in less public access than one in which a constitutional right of access is more difficult to create.

At all events, we would find this outcome incredible in an area of traditional procedural flexibility, and we are unwilling to reach it when a reasonable alternative is present. By insisting on a strong tradition of public access in the Richmond Newspapers test, we preserve administrative flexibility and avoid constitutionalizing ambiguous, and potentially unconsidered, executive decisions.

IV. DOES THE RICHMOND NEWSPAPERS"LOGIC"
PRONG, PROPERLY APPLIED, SUPPORT A RIGHT OF
ACCESS?

Even if we could find a right of access under the Richmond Newspapers logic prong, absent a strong showing of openness under the experience prong, a proposition we do not embrace, we would find no such right here. The logic test compels us to consider "whether public access plays a significant positive role in the functioning of the particular process in question." Press-Enterprise II, 478 U.S. at 8. The

District Court observed that "there are abundant similarities between these proceedings and judicial proceedings in the criminal and civil contexts," and concluded that "the same functional goals served by openness in the civil and criminal judicial contexts would be equally served in the context of deportation hearings." North Jersey Media, 205 F.Supp. 2d at 301. As we have discussed supra, we agree that deportation proceedings look very much like judicial trials. As we will now explain, however, we find that the logic inquiry has drifted from its

intended role and that, properly conceived, it does not support openness in this case.

In Press-Enterprise II, the case that formalized the Richmond Newspapers test, the Court identified several reasons that openness plays a significant positive role in preliminary hearings. It recognized that "[b]ecause of its extensive scope, the preliminary hearing is often the final and most important step in the criminal proceeding," and in many cases it "provides the sole occasion for public observation of the criminal justice system." Id. at 12 (citation omitted). Similarly, it found that "the absence of a jury, long recognized as an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge, makes the importance of public access to a preliminary hearing even more significant." Id. at 12-13 (citations omitted). Summarizing that "[d]enying the transcript of a [ ] preliminary hearing would frustrate what we have characterized as the 'community therapeutic value' of openness," it concluded that a qualified First Amendment right of access attaches to preliminary hearings. Id. at 13.

In subsequent cases, this Court has noted six values typically served by openness: "[1] promotion of informed discussion of governmental affairs by providing the public with the more complete understanding of the judicial system; [2] promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings; [3] providing a significant community therapeutic value as an outlet for community concern, hostility and emotion; [4] serving as a check on corrupt practices by exposing the judicial process to public

31

scrutiny; [5] enhancement of the performance of all involved; and [6] discouragement of perjury." Simone, 14 F.3d at 839.

We agree with the District Court and the Sixth Circuit that openness in deportation hearings performs each of these salutary functions, but we are troubled by our sense that the logic inquiry, as currently conducted, does not do much work in the Richmond Newspapers test. We have not found a case in which a proceeding passed the experience test through its history of openness yet failed the logic test by not serving community values. Under the reported cases, whenever a court has found that openness serves community values, it has concluded that openness plays a "significant positive role" in that proceeding. But that cannot be the story's end, for to gauge accurately whether a role is positive, the calculus must perforce take account of the flip side -- the extent to which openness impairs the public good. We note in this respect that, were the logic prong only to determine whether openness serves some good, it is difficult to conceive of a government proceeding to which the public would not have a First Amendment right of access. For example, public access to any

government affair, even internal CIA deliberations, would "promote informed discussion" among the citizenry. It is unlikely the Supreme Court intended this result.

In this case the Government presented substantial evidence that open deportation hearings would threaten national security. Although the District Court discussed these concerns as part of its strict scrutiny analysis, they are equally applicable to the question whether openness, on balance, serves a positive role in removal hearings. [13] We find that upon factoring them into the logic equation, it is

---

13. We recognize that, under our approach, there is an evidentiary overlap between the Richmond Newspapers logic prong and the subsequent "compelling government interest" strict scrutiny investigation necessary upon a finding of a First Amendment access right. Nonetheless, the inquiries are not redundant because it is possible for openness to serve a positive role under a balanced logic prong even though the government has a compelling interest in closure. This would simply require that the policy rationales supporting openness be even more compelling than those supporting closure.

doubtful that openness promotes the public good in this context.

The Government's security evidence is contained in the declaration of Dale Watson, the FBI's Executive Assistant Director for Counterterrorism and Counterintelligence. Watson presents a range of potential dangers, the most pressing of which we rescribe here.

First, public hearings would necessarily reveal sources and methods of investigation. That is information which, "when assimilated with other information the United States may or may not have in hand, allows a terrorist organization to build a picture of the investigation." (Watson Dec. at 4.) Even minor pieces of evidence that might appear innocuous to us would provide valuable clues to a person within the terrorist network, clues that may allow them to thwart the government's efforts to investigate and prevent future acts of violence. Id.

Second, "information about how any given individual entered the country (from where, when, and how) may not divulge significant information that would reveal sources and methods of investigation. However, putting entry information into the public realm regarding all 'special interest cases' would allow the terrorist organization to see patterns of entry, what works and what doesn't." Id. That information would allow it to tailor future entries to exploit weaknesses in the United States immigration system.

Third, "[i]nformation about what evidence the United States has against members of a particular cell collectively will inform the terrorist organization as to what cells to use and which not to use for further plots and attacks." Id. A

related concern is that open hearings would reveal what evidence the government lacks. For example, the United States may disclose in a public hearing certain evidence it possesses about a member of a terrorist organization. If that detainee is actually involved in planning an attack, opening the hearing might allow the organization to know that the United States is not yet aware of the attack based on the evidence it presents at the open hearing. Id.

Fourth, if a terrorist organization discovers that a particular member is detained, or that information about a

plot is known, it may accelerate the timing of a planned attack, thus reducing the amount of time the government has to detect and prevent it. If acceleration is impossible, it may still be able to shift the planned activity to a yet-undiscovered cell. Id. at 7.

Fifth, a public hearing involving evidence about terrorist links could allow terrorist organizations to interfere with the pending proceedings by creating false or misleading evidence. Even more likely, a terrorist might destroy existing evidence or make it more difficult to obtain, such as by threatening or tampering with potential witnesses. Should potential informants not feel secure in coming forward, that would greatly impair the ongoing investigation. Id.

Sixth, INS detainees have a substantial privacy interest in having their possible connection to the ongoing investigation kept undisclosed. Id. at 8."Although some particular detainees may choose to identify themselves, it is important to note that as to all INS detainees whose cases have been placed in the special interest category concerns remain about their connection to terrorism, and specifically to the worst attack ever committed on United States soil. Although they may eventually be found to have no connection to terrorist activity, discussion of the causes of their apprehension in open court would forever connect them to the September 11 attacks." Id. While this stigma concern exists to some extent in many criminal prosecutions, it is noteworthy that deportation hearings are regulatory, not punitive, see Carlson v. Landon , 342 U.S. 524, 537 (1952), and there is often no evidence of any criminal wrongdoing.

Finally, Watson represents that "the government cannot proceed to close hearings on a case-by-case basis, as the identification of certain cases for closure, and the introduction of evidence to support that closure, could itself expose critical information about which activities and patterns of behavior merit such closure." (Watson Dec. at 8-9.) Moreover, he explains, given judges' relative lack of expertise regarding national security and their inability to see the mosaic, we should not entrust to them the decision

whether an isolated fact is sensitive enough to warrant closure.

The Newspapers are undoubtedly correct that the representations of the Watson Declaration are to some degree speculative, at least insofar as there is no concrete evidence that closed deportation hearings have prevented, or will prevent, terrorist attacks.14 But the Richmond Newspapers logic prong is unavoidably speculative, for it is impossible to weigh objectively, for example, the community benefit of emotional catharsis against the security risk of disclosing the United States' methods of investigation and the extent of its knowledge. We are quite hesitant to conduct a judicial inquiry into the credibility of these security concerns, as national security is an area where courts have traditionally extended great deference to Executive expertise. See, e.g., Zadvydas v. Davis, 533 U.S. 678, 696 (2001) (noting that "terrorism or other special circumstances" might warrant "heightened deference to the judgments of the political branches with respect to matters of national security"). See also Dep't of the Navy v. Egan, 484 U.S. 518, 530 (1988) (noting that "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs"). The assessments before us have been made by senior government officials responsible for investigating the events of September 11th and for preventing future attacks. These officials believe that closure of special interest hearings is necessary to advance these goals, and their concerns, as expressed in the Watson Declaration, have gone unrebutted. To the extent that the Attorney General's

---

14. The Newspapers contend that speculative evidence is insufficient to withstand strict scrutiny. See Press-Enterprise II, 478 U.S. at 13 (requiring "specific, on the record findings"); Globe Newspaper, 457 U.S. 596, 609 (1982) (finding government interest insufficient to merit closure without accompanying empirical support). While we acknowledge the force of this contention, strict scrutiny is appropriate only after finding a First Amendment right. Because we find no such right to attend deportation hearings, the speculative nature is not fatal.

35

national security concerns seem credible, we will not lightly second-guess them.15

We are keenly aware of the dangers presented by deference to the executive branch when constitutional liberties are at stake, especially in times of national crisis, when those liberties are likely in greatest jeopardy. On balance, however, we are unable to conclude that openness plays a positive role in special interest deportation hearings at a time when our nation is faced with threats of such profound and unknown dimension.

V. CONCLUSION

Whatever the outer bounds of Richmond Newspapers might be, they do not envelop us here. Deportation

---

15. It is worth clarifying that we do not here defer to the Executive on the basis of its plenary power over immigration. We do not question that the "power to expel or exclude aliens" is"a fundamental sovereign attribute . . . largely immune from judicial control," Fiallo v. Bell, 430 U.S. 787, 792 (1977) (quoting Shaughnessy v. United States ex rel. Mezei, 342 U.S. 206, 210 (1953)), for indeed there is no dispute as to the government's substantive power to expel the special interest detainees. Rather, what is at stake is the means the government has chosen to exercise that plenary power.

In INS v. Chadha, 462 U.S. 919, 940-41 (1983), the Court heard a challenge to Congress's decision to create a one-House veto over certain deportation decisions made by the Attorney General. In striking down the legislative veto, the Court noted that "what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power." Id. Most recently, in Zadvydas, 533 U.S. at 695-97, the Court held that despite the government's plenary power to expel immigrants, the Attorney General lacked the authority indefinitely to detain non-citizens whose countries were unwilling to accept their return, and it cited Chadha for the proposition that "Congress must choose a constitutionally permissible means of implementing" its immigration power. Id. at 695 (quoting Chada, 462 U.S. at 941-42). The issue at stake in the Newspapers' suit is not the Attorney General's power to expel aliens, but rather his power to exclude reporters from those proceedings. This is plainly a constitutional challenge to the means he has chosen to effect a permissible end, and under Zadvydas we owe no executive deference. We defer only to the executive insofar as it is expert in matters of national security, not constitutional liberties.

36

proceedings' history of openness is quite limited, and their presumption of openness quite weak. They plainly do not present the type of "unbroken, uncontradicted history" that Richmond Newspapers and its progeny require to establish a First Amendment right of access. We do not decide that there is no right to attend administrative proceedings, or even that there is no right to attend any immigration proceeding. Our judgment is confined to the extremely narrow class of deportation cases that are determined by the Attorney General to present significant national security concerns. In recognition of his experience (and our lack of experience) in this field, we will defer to his judgment. We note that although there may be no judicial remedy for these closures, there is, as always, the powerful check of political accountability on Executive discretion.

The importance of this case has not escaped us. As we approached it, we were acutely aware that the countervailing positions of the parties go to the heart of our institutions, our national values, and the republic itself. Commenting upon the great national dilemma in which this case ineluctably embroils us -- the eternal struggle between liberty and security -- a number of newspapers have

editorialized favorably upon Judge Keith's eloquent
language in the Detroit Free Press case:

> "Democracies die behind closed doors," . . ."When
> government begins closing doors, it selectively controls
> information rightfully belonging to the people. Selective
> information is misinformation."

Others have been less impressed. Michael Kelly has
written in the Washington Post:

> "Democracies die behind closed doors. So they do,
> sometimes. But far more democracies have succumbed
> to open assaults of one sort or another -- invasions
> from without, military coups and totalitarian
> revolutions from within -- than from the usurpation-
> by-in-camera-incrementalism that Judge Keith fears.
>
> Democracy in America does at this moment face a
> serious threat. But it is not the threat the judge has in
> mind, at least not directly. It is true that last
> September's unprecedented mass-slaughter of

> American citizens on American soil inevitably forced
> the government to take security measures that
> infringed on some rights and privileges. But these do
> not in themselves represent any real threat to
> democracy. A real threat could arise, however, should
> the government fail in its mission to prevent another
> September 11. If that happens, the public will demand,
> and will get, immense restrictions on liberties.

Although Mr. Kelly ultimately sided with openness on a
case by-case basis, we find his quoted statements powerful.
They certainly seem appropriate to the decision to close the
deportation hearings of those who may have been affiliated
with the persons responsible for the events of September
11th, all of the known perpetrators of which were aliens.
And they are consonant with the reality that the persons
most directly affected by the Creppy Directive are the
media, not the aliens who may be deported. As always,
these aliens are given a heavy measure of due process --
the right to appeal the decision of the Immigration Judge
(following the closed hearing) to the Board of Immigration
Appeals (BIA) and the right to petition for review of the BIA
decision to the Regional Court of Appeals. See also INS v.
St. Cyr, 533 U.S. 289, 300 (2001) (noting that because the
Constitution "provides the Writ of Habeas Corpus shall not
be suspended, . . . some judicial intervention in deportation
cases is unquestionably required by the Constitution").

Because we find that open deportation hearings do not
pass the two-part Richmond Newspapers test, we hold that
the press and public possess no First Amendment right of
access. In the absence of such a right, we need not reach
the subsequent questions whether the Creppy Directive's
closures would pass a strict scrutiny analysis and whether

the District Court's "national in scope" injunction was too broad.

The judgment of the District Court will be reversed.

SCIRICA, Circuit Judge, dissenting:

At issue is not whether some or all deportation hearings of special interest aliens should be closed, but who makes that determination. The answer depends on how we interpret the First Amendment of the Constitution.

The Constitution is silent on the right to public access. But the Supreme Court has framed a qualified right of access that may be overcome by sound reasons. Because no reason is more compelling than national security, closure of special interest alien deportation hearings may well be warranted.

The Supreme Court's test in Richmond Newspapers -- when a right of access attaches to a particular type of proceeding and whether it may be overcome--applies here. Therefore, I agree with the majority that this test applies to deportation hearings.[1] But I believe the requirements of that test are met. Consequently, I would find a qualified right of access to deportation hearings. Because I believe that Immigration Judges can make these determinations with substantial deference to national security, I would affirm the District Court's judgment.[2]

I. Experience

The Supreme Court has articulated a functional inquiry to determine whether "the place and process have historically been open to the press and general public." Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8 (1986) ("Press-Enterprise II"). Deportation hearings have a consistent history of openness. Congress first adopted immigration statutes at the end of the nineteenth century. In so doing, Congress expressly closed exclusion proceedings while leaving deportation hearings presumptively open. For at least one hundred years, deportation hearings have remained presumptively open to the public.

_____

1. Accordingly, I agree with much of parts I and II of the court's learned opinion.

2. At the same time, I would reverse the District Court's injunction as it applies nationwide. See Section IV, infra.

Department of Justice regulations, enacted in 1964, provide express approval for presumptively open hearings.

See 8 C.F.R. S 242.16(a) (1964) ("All hearings, other than exclusion hearings, shall be open to the public except that . . . [f]or the purpose of protecting . . . the public interest, the Immigration Judge may limit attendance or hold a closed hearing."). Although deportation hearings have been only presumptively open, Richmond Newspapers itself only recognizes a qualified right of access for criminal proceedings, which may be restricted by a countervailing public interest. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580-81 (1980); see also Press-Enterprise II, 478 U.S. at 10; Globe Newspaper v. Superior Court , 457 U.S. 596, 606-07 (1982).3

The Supreme Court has noted that we must assess history "because a tradition of accessibility implies the favorable judgment of experience." Press-Enterprise II, 478 U.S. at 8 (internal quotation omitted); see also Globe Newspaper, 457 U.S. at 605; Richmond Newspapers, 448 U.S. at 589 (Brennan, J., concurring). But this historical assessment does not cabin our review only to proceedings with a pre-constitutional history of openness.4 Other factors may reveal a favorable judgment of experience for presumptive access to deportation hearings.

Notably, Press-Enterprise II relies upon nineteenth and twentieth century history to find a tradition of openness for criminal preliminary hearings. 478 U.S. at 10. In that case, the Supreme Court observed that "[t]he vast majority of States considering the issue have concluded that the same

_____

3. While exceptions exist for deportation hearings involving abused alien children and spouses, criminal trials have similar exceptions (e.g., there is no public right of access to juvenile criminal proceedings).

4. Our Court of Appeals has not framed a bright-line test for determining when a historical tradition is lengthy enough to satisfy Richmond Newspapers's experience prong. Our decisions suggest, however, that a more than one hundred year history of openness is sufficient to justify the conclusion that the experience prong has been satisfied. See, e.g., Whiteland Woods, L.P. v. Township of West Whiteland , 193 F.3d 177 (3d Cir. 1999); United States v. Simone, 14 F.3d 833 (3d Cir. 1994); United States v. Smith, 776 F.2d 1104 (3d Cir. 1985); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059 (3d Cir. 1984).

40

tradition of accessibility that applies to criminal trials applies to preliminary proceedings." Id. at 10 n.3. These state court decisions confirmed the value of openness and the Supreme Court thus determined that "[o]pen preliminary hearings . . . have been accorded the favorable judgment of experience." Id. at 11 (quoting Globe Newspaper, 457 U.S. at 605).

Furthermore, the Supreme Court has recognized that the Founders "could not have anticipated the vast growth of the administrative state." Fed. Mar. Comm'n v. S.C. State Ports Auth., 122 S. Ct. 1864, 1872 (2002). In South Carolina Ports

Authority, the Court observed that "formalized administrative adjudications were all but unheard of in the late 18th century and early 19th century." Id.5 For administrative proceedings, therefore, it would appear that the experience inquiry should consider the tradition of access to a particular proceeding within the history of the modern administrative state.6

The Supreme Court also noted in South Carolina Ports Authority that some administrative adjudications share "numerous common features" with civil judicial proceedings, including an adversarial nature. Id. at 1872-73 (citing Butz v. Economou, 438 U.S. 478, 513 (1978) (listing similarities between administrative and judicial proceedings)). Based upon these similarities, the Court in both South Carolina Ports Authority and Butz concluded that constitutional principles applicable to civil trials were

_____

5. The Supreme Court has recognized that the"[m]ultiplication of federal administrative agencies and expansion of their functions to include adjudications which have serious impact on private rights [was] one of the dramatic legal developments of the [first half of the twentieth century]." Wong Yang Sung v. McGrath, 339 U.S. 33, 36-37 (1950).

6. Congress crafted the system of deportation hearings during the early years of the modern administrative state. See  1 Richard J. Pierce, Jr., Administrative Law Treatise S 1.4, at 9 (4th ed. 2002) (describing the historical developments of administrative law); Marian L. Smith, An Overview of INS History, in A Historical Guide to the U.S. Government 305, 305 (George Thomas Kurian ed., 1998) (detailing how the United States did not begin to question its policy of "free and open immigration" until the late 1800s). Since then, deportation hearings have remained presumptively open.

41

relevant to the administrative proceedings at issue. 7 Deportation hearings share these common features. I agree with the majority, therefore, that "on a procedural level, deportation hearings and civil trials are practically indistinguishable." Majority Op. at 28.8

That the historical tradition supports access to deportation hearings does not imply the existence of a qualified right of access for all administrative proceedings.9 For example, Social Security benefits claim proceedings are distinguishable. They "are inquisitorial rather than adversarial," in that the Administrative Law Judge undertakes multiple roles as the investigator, counselor, and adjudicator. Sims v. Apfel, 530 U.S. 103, 110-11 (2000). The Supreme Court has identified the differences between Social Security claims and other administrative proceedings:

> The differences between courts and agencies are
> nowhere more pronounced than in Social Security
> proceedings. Although many agency systems of
> adjudication are based to a significant extent on the

> judicial model of decisionmaking, the SSA is perhaps
> the best example of an agency that is not.

Id. at 110 (internal quotations omitted). 10

---

7. I agree with the majority that the South Carolina Ports Authority holding may not extend "the full panoply of constitutional rights to any administrative proceeding that resembles a civil trial." Majority Op. at 28. The Supreme Court left this question for another day. But its comparison of administrative proceedings to civil trials remains instructive.

8. On this level, a deportation hearing "walks, talks, and squawks like a civil lawsuit." South Carolina Ports Authority, 122 S. Ct. at 1873 (internal quotation omitted).

9. As the Supreme Court has noted, there is a distinction between liberty and property interests in administrative hearings. Wong Yang Sung, 339 U.S. at 50-51.

10. Deportation hearings are adversarial proceedings that share many of the features common to civil judicial proceedings that the Supreme Court enunciated in South Carolina Ports Authority:

> Federal administrative law requires that agency adjudication contain
> many of the same safeguards as are available in the judicial

42

Congress has provided for presumptively open
deportation proceedings from the moment that it first
enacted an immigration statutory framework. This century
of unbroken openness, especially within the nascent
tradition of the administrative state, "implies the favorable
judgment of experience" under the Richmond Newspapers
test.

II. Logic

Public access to deportation hearings serves the same
positive functions as does openness in criminal and civil
trials. But the logic inquiry cannot consist merely of a
recitation of the factors supporting open proceedings. "An
assertion of the prerogative to gather information must . . .
be assayed by considering the information sought and the
opposing interests invaded." Richmond Newspapers, 448
U.S. at 588 (Brennan, J., concurring); accord  Majority Op.
at 32 ("[T]he calculus must perforce take account of the flip
side--the extent to which openness impairs the public
good."). I agree with the majority that the District Court
erred in failing to consider the countervailing interest of
national security.

---

> process. The proceedings are adversary in nature. They are
> conducted before a trier of fact insulated from political influence. A
> party is entitled to present his case by oral or documentary
> evidence, and the transcript of testimony and exhibits together with

the pleadings constitutes the exclusive record for decision. The parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record.

South Carolina Ports Authority, 122 S. Ct. at 1873 (quoting Butz, 478 U.S. at 513).

The Supreme Court has held that deportation hearings require a heightened standard of proof, suggesting their unique position within the context of administrative proceedings. Woodby v. INS, 385 U.S. 276, 286 (1966) (requiring clear, unequivocal, and convincing evidence to support the grounds for deportation). Conversely, many of the other administrative proceedings cited by the government do not share as many of the South Carolina Ports Authority common factors, and they may contain other features--the protection of privacy, reputation, and medical information--that counsel against access.

43

The issue in this case is "whether the press and public have a First Amendment right to attend deportation hearings." Majority Op. at 18. The logic analysis set forth by the Supreme Court is directed at a particular structural type of proceeding--in this case, deportation hearings--not a subset based on specific designations such as terrorism. In Globe Newspaper, the Court stated this point most clearly. Appellees in that case sought to limit the Richmond Newspapers analysis to rape trials. The dissent in Globe Newspaper cited evidence of "a long history of exclusion of the public from trials involving sexual assaults, particularly those against minors." 457 U.S. at 614. The Court rejected this suggestion, stating, "Whether the First Amendment right of access to criminal trials can be restricted in the context of any particular criminal trial, such as . . . a rape trial, depends not on the historical openness of that type of criminal trial but rather on the state interests assertedly supporting the restriction."11Id. at 605 n.13.

At this stage, we must consider the value of openness in deportation hearings generally, not its benefits and detriments in "special interest" deportation hearings in particular. If a qualified right of access is found to attach to deportation hearings generally, the analysis then turns to whether particular issues raised in individual cases override the general limited right of access.

Were the logic analysis focused only on special interest cases, I would agree that national security would likely trump the arguments in favor of access. Although paramount in certain deportation cases--like terrorism-- national security is not generally implicated in the panoply of deportation hearings that occur throughout the United States. There are many grounds for deportation--marriage fraud, moral turpitude convictions, and aggravated felonies,

---

11. Courts have consistently applied Richmond Newspapers in this way. See, e.g., Press-Enterprise II, 478 U.S. at 9 (preliminary hearings); Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 508 (1984) ("Press-

Enterprise I") (criminal trial voir dire); Richmond Newspapers, 448 U.S. at 580 (criminal trials); Detroit Free Press v. Ashcroft, 2002 WL 1972919 (6th Cir. 2002) (detention hearings); First Amendment Coalition, 784 F.2d at 473 (judicial review proceedings); Smith, 776 F.2d at 1112 (bills of particular); Publicker, 733 F.2d at 1069-70 (civil trials).

to name a few--that do not ordinarily implicate national security.12 See 8 U.S.C.S 1227(a).

Accordingly, the demands of national security under the logic prong of Richmond Newspapers do not provide sufficient justification for rejecting a qualified right of access to deportation hearings in general. To conclude otherwise would permit concerns relevant only to a discrete class of cases to determine there is no qualified right of access to any of the broad range of deportation proceedings, a departure from Richmond Newspapers. Whether national security interests justify closure of individual deportation hearings is a question properly addressed in the next step's more particularized inquiry.

III. Government Interests

Having found a qualified right of access to deportation hearings, the question remains whether the government has a sufficient justification to "override the qualified First Amendment right of access" by application of the Creppy Directive. Press-Enterprise II, 478 U.S. at 9.

Where a qualified right of access has been found, courts ordinarily have required a substantial showing to deny access. "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Press-Enterprise I, 464 U.S. at 510. There must be "a substantial probability" that openness will interfere with these interests. Press-Enterprise II, 478 U.S. at 14. Closure is appropriate only if "reasonable alternatives to closure" are not available to protect the government's interests. Id. It bears noting,

_____

12. National security presents similar challenges in some criminal prosecutions. See 50 U.S.C. S 1801 et seq. (authorizing the Foreign Intelligence Surveillance Court to issue search warrants in closed proceedings to protect national security). But national security interests have not been sufficient to reject a qualified right of access to criminal trials in general. Instead, if access can be limited, it is because "national security concerns about confidentiality may sometimes warrant closures" as a "countervailing interest[ ] . . . sufficiently compelling to reverse this presumption of openness." Richmond Newspapers , 448 U.S. at 598 & n.24 (Brennan, J., concurring).

however, that these cases have not considered the

deference due the government in matters involving national security.

The District Court found the Creppy Directive failed to pass muster under this test because, inter alia, 13 it was "not persuaded that the more narrow method of in camera disclosure of sensitive evidence . . . is not an acceptable means of avoiding a compromise of the government's investigation." N. Jersey Media Group, Inc. v. Ashcroft, 205 F. Supp. 2d 288, 302 (D.N.J. 2002).

The government contends it is entitled to greater deference than is captured in this test because of two independent considerations. First, it contends it enjoys broad deference in the immigration area. And second, it argues the District Court erred in failing to afford it the special deference due the political branches in matters concerning national security.

The District Court undervalued the deference due the government in national security cases.14  Id. at 301-02. Courts have consistently recognized the need for "heightened deference to the judgments of the political

_____

13. The District Court also found the Creppy Directive inadequate to the extent it is not fully effective at blocking public access to sensitive information, since the information might become public by any of several other means. N. Jersey Media Group, 205 F. Supp. 2d at 301. In my view, the government's rejoinder effectively disposes of this finding.

14. Courts also must acknowledge the "immigration-related expertise of the Executive Branch," and afford its judgments an appropriate level of deference. Zadvydas v. Davis, 533 U.S. 678, 700 (2001). As the District Court acknowledges, the government has traditionally enjoyed near-plenary power to determine the substance of immigration law. Reno v. Flores, 507 U.S. 292, 305 (1993); Yamayata v. Fisher, 189 U.S. 86, 100-101 (1903). But the courts have been less likely to defer to the government on procedural issues where constitutional rights may be affected. Zadvydas, 533 U.S. at 695; INS v. Chadha, 462 U.S. 919, 941-42 (1983). Even in this area, however, the Executive Branch is entitled to a measure of deference given its primary responsibility over immigration matters. Administrative law principles"counsel judges to give expert agencies decisionmaking leeway in matters that invoke their expertise." Zadvydas, 533 U.S. at 700. Therefore, executive decisions in this area should be accorded a special degree of deference.

branches with respect to matters of national security" when "terrorism or other special circumstances" are at issue. Zadvydas, 533 U.S. at 696. A "principle of judicial deference . . . pervades the area of national security." Franklin v. Massachusetts, 505 U.S. 788, 818 (1992). Consequently, courts have not demanded that the government's action be the one the court itself deems most appropriate in "cases involving discrete categories of governmental action in which there are special reasons to defer to the judgment of the political branches." Church of

the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 570 n.5 (1993) (Souter, J., concurring); see also Rostker v. Goldberg, 453 U.S. 57, 70 (1981).

On the other hand, deference is not a basis for abdicating our responsibilities under the First Amendment. Rostker, 453 U.S. at 67; United States v. United States Dist. Court, 407 U.S. 297 (1972) ("domestic security" not a sufficient basis for relaxing warrant requirement; independent assessment of surveillance needs by magistrate generally required); New York Times Co. v. United States , 403 U.S. 713, 714 (1971); United States v. Robel, 389 U.S. 258, 264 (1967) ("Even the war power does not remove constitutional limitations safeguarding essential liberties. . . . Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart.") (internal quotation omitted). At issue is whether the Creppy Directive constitutes an impermissible restriction on the press and public's right of access to deportation hearings. Moreover, there is no apparent reason to abandon the traditional framework for assessing the relative force of the government's interests as against the right of access, so long as deference is afforded the judgments of the Executive Branch in these matters. Cf. Rostker, 453 U.S. at 70 ("We do not think that the . . . law will be advanced by any further 'refinement' in the applicable tests as suggested by the Government" to accommodate deference in military affairs.).

In this case, the government's asserted interest--national security--is exceedingly compelling. Closure in some--or perhaps all--special interest cases may be necessary and appropriate. In fact, the Department of Justice regulations,

47

enacted in 1964, expressly authorize an Immigration Judge to hold closed hearings to protect the public interest. But the question remains whether the Creppy Directive's blanket closure rule--which removes the decision to close the hearing from the Immigration Judge on a case-by-case basis--is reasonably necessary for the protection of national security.

The government contends that a case-by-case closure of removal proceedings would permit the release of sensitive information, potentially revealing sources, patterns and methods of investigation. But there is no reason that all of the information related to a particular detainee cannot be kept from public view. Even the initial determination to close a proceeding--and to seal the entire record--can be accomplished in camera and under seal. The government need only make the required showing of special interest, under seal to the Immigration Judge, subject to appellate review. In making their determinations, Immigration Judges should grant substantial deference to national security interests. A similar procedural framework has proven workable with criminal prosecutions.15

The government maintains that these protections would be ineffective given the complexities in combating terrorism. It contends that individual, seemingly innocuous pieces of information, including a special interest alien's name, could be harmful to national security when compiled by terrorists into a mosaic. This seems correct. Nevertheless, the government could make the same argument to an Immigration Judge, who could determine, with substantial

---

15. The Classified Information Procedures Act provides for pretrial conferences and motion hearings to determine limits on the use and disclosure of classified and national security related information in criminal prosecutions. 18 U.S.C. App. 3 SS 2-4, 6, 8. These proceedings may be held in camera and, in certain circumstances, ex parte. Id. SS 2-4, 6; United States v. Kilmavicius-Viloria, 144 F.3d 1249, 1260-61 (9th Cir. 1998). Congress also has created the Foreign Intelligence Surveillance Court to hold closed reviews of search warrant requests on a case-by-case basis, rejecting a framework where the Department of Justice makes its own judgments on these matters in national security cases. 50 U.S.C. S 1801 et seq.

48

deference, that the apparently innocuous information provides appropriate grounds for closure.

The Watson Declaration also expresses the fear that open deportation hearings could provide evidence to terrorists that certain border crossings offer a greater chance for illegal entry than others. At oral argument, government counsel offered an intriguing hypothetical where open hearings would reveal evidence that 0-of-30 terrorists had entered the United States successfully through Philadelphia, while the rate was 30-of-30 in New York City. Here too, however, the government could make this argument during a closed preliminary hearing at which the Immigration Judge, with appropriate deference to national security, could assess the government's concerns about publicizing patterns of information.

The Creppy Directive and the pre-existing Department of Justice regulations both accommodate the government's national security responsibilities. But a case-by-case approach would permit an Immigration Judge to independently assess the balance of these fundamental values.16 Because this is a reasonable alternative, the Creppy Directive's blanket closure rule is constitutionally infirm.17 As the Supreme Court reasoned in Globe Newspaper:

> We emphasize that our holding is a narrow one: that a rule of mandatory closure . . . is constitutionally infirm. In individual cases, and under appropriate circumstances, the First Amendment does not necessarily stand as a bar to the exclusion from the courtroom of the press and general public . . . . But a

---

16. As noted, the Department of Justice regulations permit an Immigration Judge to close deportation hearings in their entirety in order to protect the public interest. This closure is broader in scope than what is likely to occur in criminal prosecutions because immigration proceedings call for greater deference to the government on matters of national security.

17. As noted, the Supreme Court held in Press-Enterprise II that a restriction on a qualified right of access fails if there are "reasonable alternatives to closure." 478 U.S. at 14.

> mandatory rule, requiring no particularized
> determinations in individual cases, is unconstitutional.

457 U.S. at 611 n.27.

The stakes are high. Cherished traditions of openness have come up against the vital and compelling imperatives of national security. Because I believe national security interests can be fully accommodated on a case-by-case basis, I would affirm that part of the District Court's judgment.

IV. Nationwide Injunction

The final issue is whether the scope of the District Court's nationwide injunction is overbroad. The grant of a permanent injunction is reviewed for abuse of discretion. Nutrasweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir. 1999). I would hold that the District Court abused its discretion by issuing a nationwide injunction that bars enforcement of the Creppy Directive in any special interest proceeding and against any member of the general public or press. A narrower remedy will provide full relief to plaintiffs and allow other courts to explore this difficult constitutional question.

Generally, a plaintiff is only entitled to relief for itself. Ameron, Inc. v. U.S. Army Corps of Eng'rs, 787 F.2d 875, 888 (3d Cir. 1986). In the First Amendment context, "although the occasional case requires us to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 477-78 (1995) (citation omitted). In this case, injunctive relief should apply only to those parties actually before the court if that relief fully protects the litigants. See Ameron , 787 F.2d at 890.

Furthermore, where the government is involved in litigation, a court should not "thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue." United States v. Mendoza, 464 U.S. 154, 160 (1984). Because

constitutional proscriptions frequently challenge governmental action, different parties will likely assert the same constitutional claim against the government. Id. Where this happens, the Supreme Court has said that "[a]llowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari." Id.

In this case, the only plaintiffs are North Jersey Media Group and New Jersey Law Journal. An injunction protecting these plaintiffs alone would remedy any violation of plaintiffs' First Amendment rights. Enjoining enforcement of the Creppy Directive against other parties goes beyond providing relief to plaintiffs, and it deprives the Supreme Court of the opportunity to review the decisions of several courts of appeals. For these reasons, I would reverse the District Court's nationwide injunction.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit